# Craig et al. *versus* First Presbyterian Church of Pittsburgh.

1. Where an Act of Assembly is entitled a supplement to a former act, and the subject thereof is germane to the subject of the original act, its subject is sufficiently expressed to meet the requirements of article 3, section 3, of the Constitution.

2. An Act of Assembly in providing for the removal of dead bodies from the burial-grounds of religious societies directed that no application should be made therefor "except in pursuance of the wishes of a majority of the members of such society, or church, expressed at a church election held for that purpose, after two weeks' public notice."

*Held,* that the majority intended by the act was a majority of those present and voting at such election, and that those who did not attend must be presumed to have assented.

*Held, further,* that a notice from the pulpit on Sunday was a sufficient "public notice" to meet the requirements of the act.

3. The right of voting by proxy at an election of an incorporated company is not a general right, and the party who claims it must show a special authority for that purpose; but where rejecting all the votes cast by proxy there is still a majority the minority are bound by their action.

4. There is a distinction between a corporate act to be done by a definite number of persons, and one to be performed by an indefinite number; in the first case no act can be done unless a majority of the whole body are present; in the second a majority of those who appear may act.

5. Sunday school rooms and lecture-rooms are clearly included in the "religious purposes" intended by the Act of April 18th 1877, and buildings erected therefor do not lose their religious character because of their occasional use for fairs or other benevolent objects.

6. The legislature has power to authorize the removal of the remains of the dead from cemeteries, and may delegate such power to municipalities.

7. The right of sepulture in the burying-ground of a church is not an absolute right, but a privilege to be enjoyed so long as the ground continues to be the church ground, and subject to any right which the church possesses to abandon it for purposes of interment. To entitle one, therefore, to raise the point that an Act of Assembly, authorizing the removal of the dead, impairs the obligation of a contract, it is not sufficient to show that he is a pew-holder in the church, or has relatives interred in its grounds; but he must show by the record that he has rights of sepulture in said grounds, or some contract relation with the church.

November 8th and 9th 1878.    Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and TRUNKEY, JJ.    WOODWARD, J., absent.

Certiorari to the Court of Quarter Sessions of *Allegheny county:* Of October and November Term 1877, No. 266.

The proceedings in the court below commenced by a petition on the part of the Trustees of the First Presbyterian Church of Pittsburgh, asking the court for a decree to remove the remains of the dead from a portion of the burial-grounds of said church.

The facts, in substance, were these: On May 19th 1874, the General Assembly passed "An act (Pamph. L. 208) relative to burial-grounds and cemeteries in incorporated boroughs," which authorized the Courts of Quarter Sessions " to make such orders and decrees for the regulation and care of burial-grounds in incor-

[Craig *v.* First Presbyterian Church.]

porated boroughs, as the public shall require; and when any such burial-ground shall become so neglected as, in the opinion of said court, to become a public nuisance, the court may direct the removal of the dead therefrom, by the proper borough authorities, to some other properly regulated burial-ground."

On May 13th 1876, an act was passed (Pamph. L. 159) entitled "An act supplementary to an act, entitled 'An act relative to burial-grounds and cemeteries situated in incorporated boroughs,' approved the 19th day of May 1874, changing the title of the said act and authorizing the court to make orders and decrees required by the act, and to enforce the same by process."

On the 18th of April 1877, an act was passed (Pamph. L. 54), entitled "A supplement to an act entitled 'An act supplementary to an act relative to burial-grounds and cemeteries situated in incorporated boroughs, approved the 19th day of May 1874, changing the title of said act and authorizing the court to make orders and decrees required by the act, and to enforce the same by process,' approved the 13th day of May 1876, further empowering courts to direct removal of remains in boroughs and cities, from burial-grounds where interments have ceased and such remains interfere with religious buildings or trusts."

The first section of this act of 1877 will be found in full in the opinion of this court.

On April 28th 1877, the Trustees of the First Presbyterian Church petitioned the Quarter Sessions, reciting the above Act of April 18th 1877, setting forth that their burial-ground was no longer used for interments, and praying for a decree directing them to remove the remains of the dead from so much of the burial-ground of the church as might be required for buildings for a Sabbath school and lecture-room.

The petition further set forth that the application on the part of the trustees was made to the court in pursuance of a resolution passed at a meeting of the congregation, of which two weeks' notice had been given from the pulpit of the church. There were 712 members in the church at the time of this meeting who were entitled to vote. For the resolution there were polled in its favor 439 votes, of which 163 were personally cast and 276 by proxy. Against it there were 14 polled, of which 4 were cast personally and 10 by proxy.

Isaac Craig, a pew-holder and member of the church, who had relatives buried in the churchyard, and John B. Guthrie, who had two children and other relatives buried there, appeared in court and filed exceptions, as follows:—

1. The subject of the Act of April 18th 1877, under which the petitioners are proceeding, is not clearly expressed in the title as required by art. 3, sect. 3 of the Constitution.   2. Said act is unconstitutional.   3. "Two weeks public notice" of the church

meeting for the purpose of voting upon the question of the removal of the remains of the dead, &c., as required by said act, was not given. 5. The ground to be taken for the proposed new building is not sufficiently defined, either by the petition or otherwise. 6. The case of the petitioners is not within the purview of the Act of Assembly. 7. The purposes to which the proposed new buildings are to be put are not of the religious purposes contemplated by the Act of Assembly. 8. There is no necessity for the proposed encroachment upon the graves of the dead. 9. The ground proposed to be taken for the purposes of said buildings should have been defined before the action of the congregational meeting. 10. The testimony shows that there are 712 members of the First Presbyterian Church of Pittsburgh; that of this number only 163 members attended the meeting held April 18th 1877, and voted in favor of the resolution authorizing the trustees to apply to the Court of Quarter Sessions for leave to remove the remains of the dead from the graveyard, the remainder of the votes in favor of such application having been cast by proxies, without any authority of law. Therefore, the requirements of the proviso to the 1st section of the Act approved April 18th 1877, that no application should be made except in pursuance of the wishes of a majority of the members of the church expressed at a church election held for that purpose, have not been complied with.

A commissioner was appointed to take testimony, and after the coming in of the same, the court having signified their intention to grant the prayer of the petition, the counsel of petitioners submitted to the exceptants the draft of a decree specifying the ground to be taken by metes and bounds. The exceptants objected thereto, because " the ground described in and covered by the proposed decree is of greater extent, and, in part, upon a different location than that referred to and covered by the proofs in this case.

The court, Collier, J., overruled all the exceptions, and made a decree in accordance with the prayer of the petitioners. This action of the court was the error assigned by the exceptants, who took this writ.

*M. W. Acheson* and *George W. Guthrie*, for exceptants.—The subject was not clearly expressed in the title, and the act was unconstitutional: art. 3, sect. 3. of Constitution; State Line and Juniata Railroad Co.'s Appeal, 27 P. F. Smith 431; Allegheny County Home's Appeal, Id. 80; Dorsey's Appeal, 22 Id. 195. The legislation in the Act of 1877 is not germane to the subject of the Acts of 1874 and 1876. The title of the Act of 1877 was misleading. The privilege of burial in the churchyard was purchased, and there was a contract that the bodies should remain undisturbed by the church. In the absence of express authority, members of a corporation cannot vote by proxy: Phillips *v.* Wick-

[Craig v. First Presbyterian Church.]

ham, 1 Paige 578; Taylor v. Griswold, 2 Green Ch. 226; Brown v. Commonwealth, 3 Grant 209. The "two weeks public notice" required by the act was not given. The ground proposed to be appropriated for the new buildings should have been defined before the holding of the congregational meeting, so that the meeting could act intelligently; or, if that was not necessary, it should at least have been defined in and by the petition: O'Hara v. Pennsylvania Railroad Co., 1 Casey 445. The purposes indicated in the petition "Sunday school and lecture-room," are not the "religious purposes only" contemplated by the act.

*David W. Bell, contra.*

Mr. Justice PAXSON delivered the opinion of the court, January 6th 1879.

It was provided by the first section of the Act of 18th of April 1877, Pamph. L. 54, "That when by the growth of cities and the opening of incorporated cemeteries in the vicinity thereof, or from other causes, any burial-ground belonging to or in charge of any religious society or church, directly or through trustees therefor, has ceased to be used for interments, the courts of Quarter Sessions of the several counties of this Commonwealth, upon petition of the managers, officers or trustees of such society or church, setting forth that the erection, extension or improvement of buildings for religious purposes of such society or church are hampered and interfered with, and the welfare of such religious society or church is injured to the detriment thereof and of the public good, and after four weeks' advertisement of hearing in open court for the purpose, may, after a full hearing of the parties therein, proofs and allegations, authorize and direct the removal of the remains of the dead from so much of such burial-ground as may be needed for buildings for religious purposes only, by the managers, officers or trustees of such society or church; *Provided*, that no such application shall be made by the managers, officers or trustees of such society or church, except in pursuance of the wishes of a majority of the members of such society or church, expressed at a church election, held for that purpose after two weeks' public notice." Under this act, the trustees of the First Presbyterian Church of Pittsburgh, presented their petition to the Court of Quarter Sessions of Allegheny county, setting forth, inter alia, that the burial-grounds attached to and belonging to said church had ceased to be used for the interment of the dead; that a portion of said ground was needed for the erection of a new Sabbath school building and lecture-room; that such building was intended only for the religious purposes of said church, and that the same is interfered with, to the detriment of the said church and the public good; that in accordance with the terms of said Act of Assembly, at the request of the trustees of said church, public notice

[Craig *v.* First Presbyterian Church.]

was given from the pulpit in said church on the three Sabbath days preceding the 18th of April 1877, that on said day, a meeting of the congregation would be held in the church, for the purpose of voting whether or not the trustees should be requested to petition the said court to authorize and direct the removal of the remains of the dead from a portion of the burying-ground of the church, needed for the erection of a new Sabbath school building and lecture-room; that thereupon, after said public notice, a meeting of said congregation was held at the time and place appointed, which was duly organized, and at which the wishes of a majority of the members of said congregation were expressed in favor of such removal, and a resolution was passed, directing the trustees to petition the court for that purpose. The petition was so proceeded in, that said court subsequently made a decree granting the prayer of the petitioners, and ordering the removal of the remains of the dead from a portion of said burial-ground, specifying the same by metes and bounds. The plaintiffs in error filed a number of exceptions to the said petition and decree, which were overruled by the court below, whereupon said plaintiffs removed the record to this court by writ of certiorari. The assignments of error, which are somewhat numerous, may be reduced to four heads, viz.: 1. The Act of April 18th 1877, under which the proceedings were had, is in violation of the Constitution, for the reason that the subject of said act is not clearly expressed in the bill; 2. That the proceedings are irregular; 3. That the case of the petitioner is not within the purview of said Act of Assembly; and 4. The legislature had not the power to authorize the removal. We will consider these objections in the order in which they are stated.

All the presumptions are in favor of the constitutionality of an Act of Assembly. It comes to us with the seal of approval of two of the co-ordinate departments of the government. To doubt is to decide in favor of its constitutionality. It is only in a clear case that we are justified in declaring an act to be unconstitutional. We have no such clear case presented by this record. The Act of April 18th 1877, was a supplement to the Act of 13th May 1876, which was a supplement to the Act of 19th May 1874, and is germane to the subject of the original bill. This is all that is required: State Line and Juniata Railroad Company's Appeal, 27 P. F. Smith 431. They all relate to cemeteries and the removal of the dead therefrom.

There are several objections to the regularity of the proceedings. The Act of Assembly does not specify how notice shall be given to the church meeting to be called for the purpose of voting on the question of the removal of the remains of the dead from the burying-ground. It merely says such meeting shall be held after two weeks' "public notice." The record shows that notice was given from the pulpit of the church for the three Sabbaths immediately preceding the meeting. This is the usual manner of giving notice to the mem-

[Craig v. First Presbyterian Church.]

bers of a church, as to matters pertaining to the church. It is cer-
tainly "public notice," and in the absence of any specific direction
in the Act of Assembly, or in the charter of the church, must be held
to be sufficient. The objection that the ground proposed to be taken
is not sufficiently described is wholly untenable. It is set out in the
decree by metes and bounds. It was also alleged that the applica-
tion was not made in pursuance of the wishes of a majority of the
members of the church, as required by the act. This raises a ques-
tion of fact that has been decided adversely to the plaintiffs by the
court below. The ground of this objection is that the votes by proxy
were illegal. I concede that they were so. It is not a common-law
right. The right of voting at an election of an incorporated com-
pany by *proxy* is not a general right, and the party who claims it
must show a special authority for that purpose: Angell & Ames on
Corporations, §§ 127, 131, 493; Taylor v. Griswold, 2 Green
(N. J.) 223. But rejecting all votes by proxy there was still a
majority. Of the persons present at the meeting, one hundred and
sixty-three voted in favor of the resolution and four voted against it.
It is said, however, that this was not a majority of all the members
of the congregation. This is true. But it was a majority of all
who were present in obedience to the call. Those who did not at-
tend must be presumed to have assented. It is well settled upon
authority that the minority present were bound by the action of the
majority. In St. Mary's Church Case, 7 S. & R. 517, the rule is
thus laid down by Gibson, J.: "The fundamental principle of every
association for the purposes of self-government is, that no one shall
be bound except with his own consent, expressed by himself or his
representatives; but actual assent is immaterial—the assent of the
majority being the assent of all; and this is not only constructively
but actually true; for that the will of the majority shall, in all cases,
be taken for the will of the whole, is an implied but essential stipu-
lation in every compact of the sort; so that the individual who be-
comes a member assents beforehand to all measures that shall be
sanctioned by a majority of the voices." This decision is cited
approvingly in Angell & Ames, and the same principle is recognised
in Presbyterian Congregation v. Johnston, 1 W. & S. 9. The rule
is enforced daily in practice. It has never, to my knowledge, been
doubted that at a church meeting, either regular or specially called
with proper notice, the vote of the majority is binding upon the con-
gregation. It may be asked, however, what is meant by the ma-
jority? Does it mean the concurrence of the major part of those who
happen to be present at a regular corporate meeting, or does it
mean a concurrence of a majority of the whole body? There is this
distinction between a corporate act to be done by a definite number
of persons, and one to be performed by an indefinite number. In
the first case it is to be observed that a majority is necessary to con-
stitute a quorum, and that no act can be done unless a majority be

present; in the latter a majority of any number of those which appear may act. And where a corporation is composed of several integral parts, and each part consists of a definite number, a majority of each part must be present to constitute a quorum : St. Mary's Church Case, *supra.* But when a corporation consists of several integral parts, one of which is indefinite, if any number of persons composing the latter, however small, are present after having been duly summoned, it is sufficient. The distinction is between a definite and an indefinite number. In the former case a majority must be present; whereas in the latter a majority of those present may act, whether a majority of the whole body or not : Angell & Ames on Corp. 464 ; Willcock on Mun. Corp. 66 ; The King *v.* Whitaker, 9 B. & C. 648. When, therefore, the legislature, by the Act of 18th of April 1877, provided for ascertaining the wishes of a majority of the members by a church election, it is fair to presume that the majority intended by the act was the majority of those who should attend and vote at such election. The act provides for taking the sense of the congregation in the usual manner, and prescribes no new rule as to what shall be binding upon them. Had it been intended to require the assent of a majority of *all* the members, whether present at the meeting or not, such intention might and probably would have been expressed clearly in the act.

The objection that the case of the petitioners is not within the purview of the Act of Assembly, involves the further proposition, that the purposes to which the proposed new buildings are to be put are not the religious purposes contemplated by the act. If the petitioners are wrong as to the second proposition, the first necessarily falls with it. The petition alleges that the new building is to be applied only to the religious purposes of said church. There is nothing in the record that contradicts this assertion. The Sunday school rooms and the lecture-room of a modern church, are as essentially used for religious purposes as the body of the church building itself. The Sabbath schools are an important auxiliary of every Christian church, and indispensable to its life and growth. That the services in such schools are, in the main, of a religious character, is too well known to be seriously disputed. So of the lecture-room. It is used for the mid-week evening lectures and other services, when the attendance is not large. The expense of lighting and heating the main church building is thus avoided. But the services upon such occasions are as truly religious in their character as the sermon upon the Sabbath. Gass's Appeal, 23 P. F. Smith 46, has no application to the point in controversy. There, a German Reformed congregation and a Lutheran congregation built a church together, in which by their articles of association, " Divine service" only was to be held; for many years, there were no meetings in it except for public worship. It was held, under the facts of that case, that " Sabbath schools" were not included in the term, " Divine service," and

[Craig v. First Presbyterian Church.]

upon a bill filed to prevent the continued and unauthorized use of the audience room for the Sunday schools, this court, overruling the court below, granted an injunction. The distinction taken in that case, between "Divine service" and Sabbath school services was manifestly proper. Says Agnew, J., "That prayer and praise, and indeed, oral as well as written instruction in religious matters by laymen, are used in Sunday school service is true, and in a general sense it may be said to be Divine service. * * * But in its more restricted sense it is used to signify acts of religious worship." In view of the contract between the two churches, the term was confined to its restricted sense. In the case in hand, the Act of Assembly uses the words "religious purposes," a term of much wider meaning, and clearly embracing Sabbath schools and the ordinary lecture services of a church. Nor do we think it detracts from the character of the occupancy of the building, that it is proposed to use the lecture-room occasionally for social gatherings incident to the church, for societies for benevolent objects, and for fairs held by the ladies to raise funds for missionary work; nor that it is proposed to sometimes furnish a "plain tea" to those members who attend evening service from a distance. The body needs food as well as the soul. If the church requires the building for its Sabbath schools and for a lecture-room, and such purposes are religious in their nature, as we have endeavored to show, of what possible matter can it be should the church utilize said building by applying it to other collateral objects, not in themselves technically religious, yet germane to the general purpose. And if by such means an income is derived therefrom, there is no violation of either law or morals. We think the case of the petitioners is clearly within the purview of the Act of Assembly.

The question whether there was any necessity for the proposed encroachment upon the graves of the dead, is not legitimately before us. It might or might not have been avoided by purchasing another lot for building purposes. The Act of Assembly refers this question to the congregation, and they have decided it adversely to the plaintiffs. We see nothing upon the record to justify us in revising their discretion.

The remaining question is one of power. The church having granted the privilege of interment in its grounds to certain persons, it is contended that as against the corporation such persons have a right to have the bodies remain undisturbed. In other words, that they had certain rights of property in said burial-ground which could not be taken away except for public purposes, and upon making compensation therefor; and that the said Act of April 18th 1877 was transgressive of art. 1, sect. 17, of the Constitution, which prohibits the legislature from passing any law impairing the obligation of a contract.

Neither of the plaintiffs has such a standing in court as entitles

7 Norris—4

him to raise this question.  The plaintiff, Isaac Craig, excepts to the proceedings in the court below as " a pew-holder and member of the First Presbyterian Church of Pittsburgh," and the plaintiff, John B. Guthrie, joins in said exceptions as one " who has relatives, including two children, buried in the ground proposed to be taken by said church for its new buildings."  Beyond this meagre statement there is nothing to show any contract relation between the plaintiffs and the church.  The record does not show, nor does Mr. Craig allege that he has buried any dead in the grounds, or that he has any right to do so.  Mr. Guthrie alleges that he has relatives buried there, but in no part of the record does he show that he has any rights of sepulture in said grounds or any contract relation with the church.

We might well stop here.  As, however, this point was argued on its merits, both below and in this court, we will consider it as if properly before us.

The ground in controversy was · a gift from the Penns.  It was conveyed by John Penn and John Penn, Jr., to the trustees of the Presbyterian congregation of Pittsburgh, by deed, dated September 24th 1787.  The church was incorporated five days thereafter, to wit, on the 29th of September 1787.  The ground conveyed to the church by the Penns was originally the western half of an old public burying-ground, used as· a place of interment for a period of thirty-five years before the Penns conveyed it to the church.  The French used the ground as a place of sepulture from 1753 to 1758, whilst they held Fort Duquesne.  Here they buried Beaujeux, the commander of the French and Indians at Braddock's defeat, July 9th 1755.  Afterwards, the ground was used for the same purpose by the British and Colonial troops, stationed at Fort Pitt, and subsequently by the American troops, during the Revolutionary war.  It was also used by the inhabitants from the first settlement of the country.  (*Vide* testimony of Isaac Craig.)  In the course of time the ground became so densely populated with dead bodies that it was scarcely possible to open a new grave without disturbing the remains of some one previously interred, and in 1848 or 1849 interments there ceased altogether, and its further use as a place of burial was abandoned.  It was under such circumstances that the church petitioned the court for authority to remove the remains, under the Act of 18th April 1877.

We have no accurate information as to the precise nature of the relations between the church and those privileged to bury in its grounds.  It does not appear that any one of them had any right to or title in the soil, nor any right of sepulture in any particular lot or place in the yard.  We have nothing in this entire record upon this subject except the statement of Robert Dalzell.  He says in his cross-examination : " My impression is that pew-owners were entitled to burial without paying anything for the ground.  There was

[Craig v. First Presbyterian Church.]

a book which showed all orders for interments of pew-owners and others; that book has been lost. I think that all persons, except pew-owners, paid for the privilege of burying in the churchyard, unless it was the poor of the church, and as to them I am not sure." The most that can be made of this is that the church granted a mere license or privilege to inter in its ground. To pew-holders it appears to have been granted without cost—to strangers upon a consideration. What rights does such a license confer upon the grantee? The answer is clearly given by Mr. Justice Sharswood in Kincaid's Appeal, 16 P. F. Smith, at page 420, "We hold that it was the grant of a mere license or privilege to make interments in the lots described, exclusively of others, as long as the ground should remain 'the burying-ground of the church.' Whenever by lawful authority it should cease to be a burying-ground, his right and property would cease. The lot-holder purchased a license—nothing more—irrevocable as long as the place continued a burying-ground, but giving no title to the soil. While the license continued, he could, perhaps, bring trespass or case for any invasion or disturbance of it, whether by the grantors or by strangers. But if, in the course of time, it should become necessary to vacate the ground as a burying-ground, all that he could claim, either in law or equity, would be that he should have due notice, and the opportunity afforded him of removing the bodies and monuments to some other place of his own selection, or that on his failing to do so such removal should be made by others. He accepted this grant or license subject to this necessary condition." Justice Sharswood cites a number of authorities which fully sustain his position, and also discusses at some length the rights of pew-owners in churches, which bear a close analogy to the case of rights of supulture. The principle deducible from the numerous authorities cited is that "the grant of a pew in a church edifice in perpetuity does not give to the pew-owner an absolute right of property as in a grant of land in fee. He has a limited usufructuary right only. He must be presumed, from the very nature of the subject-matter, to have taken the grant under all the conditions and limitations incident to such property." The same doctrine was held by this court in Church v. Wells's Ex'rs, 12 Harris 249; says Lowrie, J.: "A pew right is not of such a character as to prevent an absolute sale of the church edifice either by contract or judicial process; by itself it was never known as a subject of taxation; if the edifice burns down the pew right is gone; it does not prevent the society from tearing down and rebuilding the edifice, or from altering the whole interior arrangement of it; it does not authorize the pew-holder to change and decorate the pew according to his fancy, or to cut it down and carry it away; and it gives him no right to the ground on which it stands. It is, therefore, a right that is entirely peculiar."

The right of the legislature to authorize the removal of the remains

of the dead from cemeteries is well settled. So it may delegate such power to municipalities. It is a police power necessary to the public health and comfort: Kincaid's Appeal, *supra*. The founders of our cities had perhaps but a faint idea of their future growth. Nor did they, probably at that early day, realize the sanitary evils attendant upon the interment of dead bodies in crowded cities. I notice in a recent paper a statement from an eminent surgeon of the city of Philadelphia, that a dead body requires a period of from fifty to one hundred and fifty years for its entire decomposition. During all that time the air and the sources of water supply are, to a greater or less extent, affected by the noxious gases connected with such decomposition.

The graves of the dead may not be disturbed from mere wantonness. To do so is a misdemeanor and indictable both at common law and under the statute as an offence "highly indecent and *contra bonos mores.*" Conceding, however, the right of the legislature to authorize such removal by virtue of its police power, the exercise of such power is not to be interfered with or denied because accompanied with some incidental benefit to the society or church in whose interest such power is invoked. It was competent for the legislature to have passed an act merely authorizing the removal of the remains from this burial-ground. That the ground thus to be vacated is to be utilized by the church by the erection of a building for Sunday school purposes and a lecture-room, neither vitiates the act nor inflicts a wrong upon any human being, living or dead.

Speaking for myself, I have no doubt of the power of the trustees, under the deed from the Penns, and the charter of the church, to remove the remains with the consent of the congregation. I regard the application to the court, under the Act of 1877, as wholly unnecessary. Be that as it may the power of the legislature to authorize such removal is beyond doubt.

I have considered the law of this case, not its sentiment. Mere sentiment, not based upon rights of persons or property, is not of value in a judicial proceeding.

We have been unable to find any serious error in this record. The proceedings therefore are affirmed.

Chief Justice AGNEW filed the following dissenting opinion.

I cannot assent to the decision in this case. In my judgment, it offends against natural feeling and constitutional law. I grant the right of the state, in the exercise of her police power to regulate graveyards for the public good, and to remove decaying remains for the preservation of the health of the citizens. I grant her right of removal by way of eminent domain, when a great public interest requires it, but on compensation to those who have acquired a right of sepulture by contract. Yet even in this respect, the state has shown her sense of propriety and right in the General Railroad Law

of 1849, sect. 10, by excepting burial-places from the powers of a company to appropriate lands. But I deny the right of removal for individual or private interest, whether it be for building a lecture-room for a church congregation or a Sabbath school room. Its purpose is to save money by taking ground appropriated for the dead. A religious congregation is a private body, and its interests are individual, not public. Thus to coin money out of the bones of the dead, is to violate a purchaser's right of sepulture, contrary to the instincts of the race and the keenest sensibilities of the heart.

Among all tribes and nations, savage and civilized, the resting places of the dead are regarded as sacred. There memory loves to linger and plant the choicest flowers; there the sorrowing heart renews the past, rekindles into life the viewless forms of the dead, revives the scenes where once they moved, and recalls the happy hours of love and friendship. There parent and child, husband and wife, relatives and friends, with broken spirits and crushed hopes, revisit often the spot where they deposited their dead. Who does not feel the fountains of his heart broken up and the warm gushings of emotion, when standing over the green sod which covers the departed. Wherever the simple stone is placed, or the marble monument is reared, spontaneous thought inscribes upon it "sacred to the memory."

This sacredness is evidenced by one of the most touching incidents of Scripture. When Abraham standing by the dead body of Sarah, addressed the sons of Heth, saying, " I am a stranger and sojourner with you, give me a possession of a burying place with you, that I may bury my dead out of my sight:" They offered him a choice of their sepulchres; but Abraham, intent upon a possession of his own, where the remains of her he had loved might repose in security, purchased the field of Macpelah of Ephron, the Hittite, for four hundred shekels of silver. Even more touching is the reference to Jacob, who, dying in Egypt, surrounded by his children, "charged them and said unto them ' I am to be gathered unto my people, bury me with my fathers in the cave that is in the field of Macpelah.' There they buried Abraham and Sarah, his wife, there they buried Isaac and Rebecca, his wife, and there I buried Leah." Tradition has preserved to this day, the identity of the cave and the tombs of those ancient worthies, undisturbed even by the Moslem, whose mosque covers and protects their resting places.

The man who violates the homes of the dead, who erases the tablets by which affection records their lowly dwelling, is lost to natural feeling and does an act which harrows the heart and excites mankind to rage. The law seizes hold of him for condign punishment: Act 31 March 1860, sect. 47. At common law it was a misdemeanor and indictable as an offence, "highly indecent and *contra bonos mores:*" King v. Lynn, 2 Term R. 733; Commonwealth v. Cooley, 10 Pick. 37. The law enacts no new standard, but follows

[Craig *v.* First Presbyterian Church.]

only the natural impulses of the race. Even now this common instinct is swelling in united chorus from the Atlantic to the Pacific, in the voice of the press, over the robbery of the grave of Stewart. But a few short months ago, it thundered over the desecrated tomb of Harrison. And are we now to say that the desecration of scores of graves to save money to a congregation is according to law?

In my judgment it is equally against the constitutional inviolability of contracts. Can a private association, corporate or unincorporate, sell a right of sepulture to-day, and to-morrow or next year retake the ground for a lecture or a school room? It is immaterial whether a grant of sepulture confers an estate or a privilege; it is a purchased right founded in contract, which no law can violate, except for a public necessity. They who advocate this violation of nature and of the sanctity of contracts, by calling it a mere privilege, assert its application to green graves as well as moss-covered tablets. This is the necessary and logical result of their argument, for *power* stops not even when the mourners are bending over the freshly-filled earth. The power to do it to-day, is the same power which must do it to-morrow or years hence. Let it be a privilege, and this is the entire scope of the argument founded on Kincaid's Case, 16 P. F. Smith 412, yet it is a right also paid for by the legal representatives of the deceased. What law can take it away for a private purpose?

It has no analogy to the privilege of a pew and cannot fall with the building. Its occupancy is permanent, not like that of a pew, periodical and temporary. If the building fall, is burned, destroyed or rebuilt, the pew right fails with it. But the purchased grave has no such necessary and intrinsic weakness of title. There the body is laid away, according to the rites of Christian burial, and in the acts of Christian faith, to await the resurrection morn, when its dust, reanimated by the Creator's call, shall rise to meet the Lord. Then why should a Christian congregation violate instinct and law, on the ground of privilege? Poverty is the plea, but such a plea would better defend a larceny of bread to feed famished children. But can poverty sanctify this disturbance of the bones of the dead? The principles stated in Kincaid's Case go the length of my conclusions. The opinion there states that owing to its neglected condition, the graveyard was rapidly becoming a "nuisance" to the neighborhood. It is also admitted that if a congregation, from mere motives of convenience or ornament, resolve to pull down the old and erect a new church edifice, in such case the pew-holder is entitled to compensation. In Kincaid's Case, the law provided that the proceeds of the sale should first pay the expenses of removal, including the cost of new lots, and in the second should *compensate* lot-holders before any division of the funds. In this case, there is no provision for compensation. It is said also in the opinion: "But when it is an act of necessity required by the condition of the building or other imper-

[Craig v. First Presbyterian Church.]

ative exigency, he (the pew-holder) has no claim whatever to compensation." For this many cases are cited. But what necessity or exigency exists in this case? None whatever. The purpose is to raise money to build a lecture and Sunday school room, a mere improvement which the congregation ought to pay for itself. It has no analogy whatever to the case of a pew holder whose privilege fails by the destruction of the building of which it is a part. This is a contract privilege not dependent on a building. If I buy the privilege of running water, or a right of way, or a right to open my windows over my neighbor's yard, what law justifies its violation? It is a right secured by contract, which the constitution protects, here a right made sacred by those instincts of nature, which precede constitutions, and imprint upon them the highest obligations of mankind to each other.

I would reverse this decree and dismiss the petition.