The GERMAN EVANGELICAL ST. MARCUS CONGREGATION OF ST. LOUIS, a Corporation, Respondent,

v.

Esther ARCHAMBAULT et al., Appellants.

No. 50263.

Supreme Court of Missouri,

Division No. 1.

Sept. 14, 1964.

Motion for Rehearing or to Transfer to Court En Banc Denied Nov. 9, 1964.

Thomas F. Eagleton, Atty. Gen., George D. Chopin, Sp. Asst. Atty. Gen., St. Louis, for appellant, Thomas F. Eagleton, Atty. Gen. of Missouri.

Herman M. Katcher, W. Donald Dubail, Oscar E. Buder, St. Louis, for appellants, Edith C. Shelton and others.

Melville A. Ochsner, St. Louis, for respondent.

WELBORN, Commissioner.

By this action brought by The German Evangelical St. Marcus Congregation of St. Louis, the owner of a tract of land dedicated to cemetery purposes, against the defendants, owners of burial lots in such cemetery and as the representatives of all such owners, the plaintiff sought a decree authorizing the abandonment of the cemetery, removal of the remains of all persons buried therein and the approval of the sale of the property by warranty deed conveying fee simple title free of all limitations upon the use of the realty for cemetery purposes. The trial court granted the relief requested. The defendant lot owners and the Attorney General of Missouri, who was also named a party defendant on the theory that a public charitable trust was involved, have appealed. We have jurisdiction because title to

real estate is involved, in view of the object of the relief sought to terminate the interests of burial lot owners in the land in question. Billings v. Paine, Mo.Sup., 319 S.W. 2d 653, 656(4–6).

By its amended petition plaintiff alleged that it was incorporated as a religious corporation by pro forma decree on October 27, 1879; that, among its corporate powers, was the owning of real estate for conducting cemeteries; that plaintiff became the owner of real property in the City of St. Louis which had been operated as a cemetery by the trustees for the congregation of St. Marcus for many years prior to plaintiff's incorporation and that, after such acquisition, the cemetery was operated by plaintiff. The petition alleged that, on July 2, 1962, an ordinance of the City of St. Louis withdrew Old St. Marcus Cemetery from the list of cemeteries in which interment was permitted in the City of St. Louis. The petition also alleged that, prior to 1929, endowed care for cemetery property was little known and that many lots had been sold in plaintiff's cemetery under rules and regulations making the owners of the lots responsible for the care and maintenance; "that because of the death of such owners and the failure of descendants to provide such care and maintenance and due to the ravages of time and the elements the graves and lots are and have been overgrown by weeds and have become sunken and the monuments, markers, headstones and railings enclosing burial plots have been deteriorated, worn, corroded, illegible or undecipherable, and dislodged from their original sites." Plaintiff alleged that the cemetery was located in a section of the City of St. Louis which is being developed and improved with dwellings and business buildings and that the property was particularly well suited for such development; that the plaintiff has no funds for the maintenance of the cemetery and no legal duty to maintain the same; that the cemetery property is tax free and that, if removed from cemetery purposes and sold, it would be added to the city tax lists of the City of St. Louis.

The petition further alleged that plaintiff owned a large cemetery in St. Louis County, known as New St. Marcus Cemetery, and that it proposed to reinter the remains in the old cemetery in the new without cost to the lot owners or descendants of the owners of the rights of burial.

By their answers defendants generally denied the allegations of the plaintiff's petition. Some of the answers charged "that the condition described in plaintiff's petition is a result of a plan conceived and adopted by plaintiff for the purpose of intentionally allowing the cemetery owned by plaintiff known as Old St. Marcus Cemetery to deteriorate, decline in appearance, and to become an eye sore in the Community; that said plan originated on the part of the plaintiff with the plan adopted by it at a meeting of its Board of Directors in 1956; that thereafter to make said plan fully effective, that plaintiff did fail, refuse and since that date has failed to maintain, operate and properly care for the lots and properties of said cemetery." Some answers further charged that the plaintiff encouraged the enactment of the ordinance by the Board of Aldermen of the City of St. Louis by which Old St. Marcus Cemetery was removed from the list of cemeteries in the City in which interments were permitted. The crossbills of some of the defendants requested a declaration that the ordinance prohibiting further interments was void and sought an accounting of the perpetual care fund of the Old St. Marcus Cemetery.

After hearing oral testimony offered by the plaintiff and receiving documentary evidence offered by plaintiff and the defendants, the trial court entered its decree granting the relief sought in the petition and denying the relief sought in the crossbills. After their motions for new trial had been overruled, the defendants appealed to this court.

On this appeal, defendants contend that plaintiff's action was not properly brought against the defendants as a class action and that plaintiff failed to allege and prove that

defendants as class representatives had been fairly chosen and that they adequately represented the lot owners as a class. Defendants also contend that plaintiff's petition failed to state a claim on which relief may be granted because it failed to allege that the lot owners in Old St. Marcus Cemetery had abandoned their rights therein or that the cemetery was no longer kept as a cemetery, no longer preserved as a cemetery, no longer known to the public as a cemetery, or any other facts to show that it had actually been abandoned in fact; further, that the trial court erred in granting relief because the evidence did not show that the cemetery had been abandoned and showed no basis for the relief sought.

The evidence showed that the tract in question was acquired by the trustees of the predecessor organization of plaintiff, The German Evangelical Congregation of the Southern Part of the City of St. Louis, by deed dated January 3, 1856. The tract originally contained approximately 28.5 acres, but its area was subsequently reduced to 25.51 acres by the acquisition of portions thereof for street widenings.

The plaintiff corporation was incorporated by pro forma decree in 1879. The property in question was transferred, on December 4, 1916, to the plaintiff corporation by the successor trustees to the original grantees.

The deed of dedication, if any, of the property for cemetery purposes does not appear in evidence. An undated plat was introduced in evidence. Just when the use of the tract for cemetery purposes began does not clearly appear although it apparently began shortly after the 1856 acquisition. The original sale document for a lot sold in 1883 was introduced in evidence. Somewhat more than 33,000 burial sites were provided in the cemetery. At the time of the hearing in this case, 19,566 persons had been buried there.

In 1897, plaintiff opened another cemetery in St. Louis County, known as New St. Marcus Cemetery. The operation of both cemeteries has, since 1936, been by a cemetery board of five of the fourteen members of the church council, the church executive body.

The last recorded sale of a lot in the old cemetery was in 1923. Apparently no particular effort was made to sell lots in the old cemetery after that date. However, interments continued until the enactment of the city ordinance in 1962. Three interments were made in 1962, twelve in 1961, sixteen in 1960 and twenty in 1959.

On December 19, 1955, the cemetery board passed a resolution calling for the submission to the plaintiff corporation and its members a proposal that Old St. Marcus Cemetery be removed from dedication as a cemetery and abandoned as such. The minutes of the board meeting at which the resolution was adopted recited that the board had received from Louis H. Wissmann "a tentative offer of Eighty-five Thousand Dollars ($85,000) for the property now known and shown on plot as the Old St. Marcus Cemetery. The above offer is made subject to the removal of all bodies deemed necessary by the cemetery law, together with markers and stones." The minutes further recite: "The Board considered with favor this offer subject to passage of resolution and ratification by the Congregation at its annual meeting January 17, 1956."

On December 19, 1955, the church council passed a similar resolution and on January 17, 1956, the congregation authorized the cemetery board "to enter into such negotiations as they may deem proper and to give consent to the institution of such legal proceedings, including but not limited to, condemnation, as they may deem proper, and to cause such ordinances or statutes to be prepared and introduced into the proper governmental body or bodies, for the removal from dedication as a cemetery and abandoned as such, the Old St. Marcus Cemetery * * *."

The evidence in the record is limited as to what steps were thereupon taken in order

to effectuate this resolution. However, subsequent cemetery board minutes contained frequent reference to the presence at the board meetings of "Mr. L. Wissmann, Agent for Cemetery." Payments totalling $6,000 to Wissmann for expenses were approved by the board.

In July, 1961, a sale contract was entered into by the board and Frederick O. Whaley, described as a "client of Wissmann," for the sale of the old cemetery tract for a total of $760,000 conditional upon a favorable decree permitting abandonment of the cemetery and the approval of certain zoning changes.

The original petition in this case was filed March 30, 1962. Subsequently the petition was amended, apparently to allege the enactment by the City of St. Louis, on July 2, 1962, of the ordinance withdrawing Old St. Marcus Cemetery from the list of authorized burial sites in the City.

Mr. Walter H. Rathert, a member of the church council since 1952 and a member of the cemetery board since 1954, and who, according to his testimony, had spent some 12,000 hours in connection with cemetery matters since his election to the board, testified as follows, when asked what prompted the board to enact the abandonment resolution in 1955:

"Well, with the consideration of abandoning the cemetery, because of its continual financial loss, it was discussed among the Board members, and the questions came about to do the right thing, would it be possible for us to abandon the Old Cemetery and remove the remains into the New Cemetery, and, of course, that's a problem that would run in tremendous costs. The question came up in our minds as to what would be the general feeling if you went out to try to find out where you would find a client to buy a cemetery. And, in order to set the ground work, to get this thing going, we asked this party, Mr. Wissmann, to give us a tentative bid on the valuation of the cemetery after all removals had taken place."

The evidence with respect to the operation of the old cemetery showed that, from October 1, 1934 to September 30, 1960, a net amount of $40,577.13 had been transferred from the new cemetery to the old cemetery. The evidence showed that both cemetery operations were conducted from the same bank accounts. There were two accounts, a general fund account and an investment account. A large portion of the investment account was represented by the perpetual care funds for the two cemeteries which at the time of the hearing exceeded $627,000. However, only some $50,000 of that amount was credited to the old cemetery. Just when the old cemetery began receiving perpetual care payments does not appear. An audit report showed $13,054.71 in the perpetual care fund in 1929, the earliest date appearing. At the time of the hearing, the perpetual care charge per burial site in the old cemetery was $37.50. There was evidence which indicated that the amount had been less at an earlier date. The income from the fund created by such deposits was used to provide for the care perpetually of the grave sites for which such deposits had been made. At the time of the hearing, 2,290 grave sites in the old cemetery had been covered by perpetual care agreements. The new cemetery operated as a perpetual care cemetery.

For the fiscal year 1961–1962, the interest earned for the Old St. Marcus Cemetery perpetual care fund was $3,026.60 and the expense of upkeep of perpetual care lots was $1,442.51. For the fiscal year 1960–1961, the interest earned was $2,572.59 and the expense of upkeep was $1,668.79. From October 1, 1934 to September 30, 1960, there was, however, an excess of expenses for perpetual care lots over income from the perpetual care fund of $24,956.32.

There was considerable evidence relating to the item of cost of grass cutting for the nonperpetual care lots in the old cemetery. The 1883 lot sale document which was introduced in evidence contained no provision regarding the care and maintenance of the lot sold. There was introduced in evidence

a 1918 deed for a lot in the new cemetery which required the purchaser of the lot to maintain the lot. Apparently, the same form of deed was used at that time for the conveyance of lots in the old cemetery. To provide a fund for the cutting of grass, a charge of $1.00 per grave site had been made for the nonperpetual care lots. Just when this charge was first imposed does not appear. The charge had been increased to $1.25, and in 1958 to $1.50 per grave site. Throughout the years the collection of the grass cutting charge became more difficult as lot owners were scattered and the descendants of buried persons became increasingly difficult to locate. According to the board treasurer, over a 38-year period, from 1921 to 1959, total uncollected grass cutting bills amounted to $59,000.00.

In 1958, 258 grass cutting bills were sent out, but only 133 were paid. In 1959, 204 bills were sent out and 190 paid. In 1960, 187 were sent and 158 paid. In 1961, no bills were sent, but 27 lot owners paid nevertheless. In 1962, two lot owners volunteered payment, but the payments were returned.

Prior to 1956, the board had maintained the cemetery by cutting the grass every ten days to three weeks on perpetual care lots and on other lots on which grass cutting charges were paid. The grass on the remainder of the cemetery was cut at least twice a year. In 1956, 1957 and 1958, grass was cut on the perpetual care lots and on the lots on which grass cutting charges were paid, but the whole cemetery was cut only once each year. In 1958, the replacement of monuments and fences that were down or overturned and the removal of trees that were blown down were discontinued. In 1959, no grass was cut except on perpetual care lots, lots on which grass cutting charges were paid and the pathway between lots. In 1962, only perpetual care lots and some nonperpetual care lots near the entrance to the cemetery were cut. Mr. Rathert estimated that the cost of grass cutting for the entire cemetery would be $3,500 to $4,200 per year.

Just what the physical condition of the cemetery was in 1956, when the proposal for its abandonment got under way, was not shown. Plaintiff introduced into evidence two series of photographs taken in the cemetery, one series of twenty-two photographs taken November 11, 1961 and the second series of thirteen on November 1, 1962. The first series showed lots containing graves in which numerous small trees had grown to a height of some fifteen feet; lots covered with a heavy growth of weeds to a height of three to four feet; lots covered by dense growth of sprouts five to six feet in height; lots in which grave markers had fallen from their foundation and lay on the ground; markers leaning at various angles, and lots surrounded by iron fences which were broken or lay on the ground. The second series taken a year later depicts similar conditions. Altogether the plaintiff's photographic evidence showed a poorly maintained cemetery in which, however, the grave markers remained clearly visible.

The defendants introduced a series of twenty snapshots taken in the cemetery in April, 1962. Some showed conditions similar to those shown by the plaintiff's photographs. Others showed different areas in which the grounds had been reasonably well cared for.

There was evidence that, to some extent, the overturned grave markers were the result of vandalism. Prior to 1958, employees of the cemetery undertook to return to their foundations stones which had overturned. At the suggestion of the police department and in an effort to curb vandalism, the main automobile entrance gates to the cemetery were, beginning in October, 1962, open only between the hours of 8:00 A.M. and 5:00 P.M. on weekdays. The gates were closed on Saturdays, Sundays and holidays. However, the pedestrian entrance gates remained open at all times.

Until around 1952, a full-time caretaker had lived on the Old St. Marcus Cemetery grounds. At the time of the hearing, the

board employed a superintendent who was in charge of both the old and new cemeteries. Approximately ten per cent of his time was spent on the old. Other employees also worked at both the old and new cemeteries as their services were required.

A member of the cemetery board testified that tentative plans called for the remains in nonperpetual care graves in the old cemetery to be reinterred in a portion of the new cemetery in which there had been no burials. All perpetual care grave remains were to be reinterred in a portion of the new cemetery set aside for such purpose. The witness estimated that, if the old cemetery property was sold and the removal and reinterments made as planned, some $120,000 to $130,000 of the sale price would remain after the payment of all expenses. The tentative plan called for such sum to be set aside as a fund for the maintenance of the nonperpetual care graves in the new cemetery.

The petition in this case sought the right to disinter the remains in the Old St. Marcus Cemetery and to reinter them in the New St. Marcus Cemetery. It sought further a decree that, following the accomplishment of the removal of the remains from the old cemetery, the dedication of the land occupied by the Old St. Marcus Cemetery should be terminated in order that plaintiff might convey a fee simple title to such land.

■■■ In Missouri, the purchaser of a lot in a public cemetery does not acquire an estate in fee. The interest acquired is an easement or privilege of burial. Billings v. Paine, Mo.Sup., 319 S.W.2d 653, 656(4). This is the generally accepted theory in this country of the interest of a cemetery lot owner. Jackson, The Law of Cadavers, 2d, pages 356–364. Although, as did the lot transfer documents in evidence in this case, the interest is purported to be transferred "forever," it is recognized that the right conveyed "is not an absolute right of property, but a privilege or license, to be enjoyed so long as the place continues to be used as a burial-ground, subject to municipal regulation and control, and legally revo-

cable whenever the public necessity requires. It is a right of limited use for purposes of interment which gives no title to the land." Page v. Symonds, 63 N.H. 17, 19. "The holder of a lot in a cemetery belonging to a municipality or religious society for burial purposes, whether his evidence of title be by deed or certificate or other means, does not acquire an absolute title to the land, but has the right or license, exclusively of any and every other person, to bury the dead upon the subdivided plot assigned to him, and a license once acquired cannot be revoked so long as the ground continues to be used as a place of sepulture." Gowen v. Bessey, 94 Me. 114, 116, 46 A. 792, 793. See 14 C.J.S. Cemeteries § 25, p. 84; 14 Am.Jur.2d, Cemeteries, Sec. 25, p. 732.

The right of legislative authority to limit and terminate the interests of lot owners under the proper exercise of the police power has been often recognized. Thus, the prohibiting of further burials in an established cemetery has been upheld when done in the proper exercise of the police power. Laurel Hill Cemetery v. San Francisco, 216 U.S. 358, 30 S.Ct. 301, 54 L.Ed. 515; Kincaid's Appeal, 66 Pa. 411. The existence of such authority was recognized in Union Cemetery Association v. Kansas City, 252 Mo. 466, 161 S.W. 261, 271(2), although the ordinance involved in that case was held invalid on the grounds that it was enacted in the financial interests of property owners in the vicinity of the cemetery rather than for the benefit and protection of the public under the police power.

Legislative power to require or permit the removal of bodies from cemeteries in the reasonable exercise of the police power is generally recognized. Masonic Cemetery Association v. Gamage, (CCA 9), 38 F.2d 950, 71 A.L.R. 1027; see Annotation, "Constitutionality of statute or ordinance requiring, or permitting, removal of bodies from cemeteries," 71 A.L.R. 1040.

■■■ In this case there has been municipal legislative action terminating the right to make further burials in Old St. Marcus

Cemetery. However, we have no legislative requirement of, or express authorization for, the removal of bodies previously interred therein. The prohibiting of further burials did not produce, per se, an abandonment of the cemetery. Kansas City v. Scarritt, 169 Mo. 471, 69 S.W. 283, 286; Tracy v. Bittle, 213 Mo. 302, 112 S.W. 45, 49.

Thus the question with which we are here confronted is the nature and extent of the authority of a court of equity to authorize and approve a proposal for the disinterment of bodies previously interred and their reinterment elsewhere and upon the completion of such a plan to declare the abandonment of the dedication of the land for cemetery purposes. We find reported cases from other jurisdictions in which courts of equity have recognized authority of this nature in certain circumstances. In Grinnan v. Fredericksburg Lodge, 118 Va. 588, 88 S.E. 79, an injunction was sought to prevent the disinterment of bodies buried in a cemetery and their reinterment in the same cemetery in order to provide space for a memorial temple honoring George Washington, a former member of the Lodge which owned the cemetery. In refusing to enjoin the removal, the court stated (88 S.E. 80(1)):

"There is nothing in our statute law applicable to the facts here presented, nor is there anything in such statutes showing that the policy of this commonwealth is averse to the removal of graves in a reverent and proper manner under all circumstances. Code 1904, § 1416a. There can, however, be no question of the power of a court of equity to deal with a situation like the present, notwithstanding the absence of legislation on the subject, and to authorize, in its sound judicial discretion, the removal of graves or cemeteries in a proper case, after due consideration of all the facts and with due regard to the rights and feelings of all concerned."

In re Sprogell Burying-Ground, 22 Montgomery County Law Rep. (Pa.) 63, involved a petition by the trustees of a burial ground for permission to remove bodies buried therein and to reinter them elsewhere on the grounds that the land had ceased to be a desirable place for burial because it had become surrounded by manufacturing plants and railroad tracks made access to the ground inconvenient and dangerous. In granting the relief requested, the court stated (22 Montgomery Co. Law Rep. 66):

"Those who accepted the benefits of the charity could not acquire such an interest in the ground as would defeat the charity itself. If the persons whose relatives are buried in the ground can successfully resist the removal of the dead, then the ground can not be sold; and if the tract can not be sold then the trustees are without means to buy a new tract to continue the charity. Again, the removal of the dead from this abandoned or unsuitable place to a desirable burial ground is necessary in order to carry out the purpose of the grantor to provide a proper resting-place for the bodies of the dead.

"The claims and rights of a lot-owner are considered in Kincaid's Appeal, 66 Pa. 421, and Craig v. The First Presbyterian Church, 88 Pa. 51. But if in the course of time it should become necessary to vacate the ground as a burying-ground, all he could claim, either in law or equity, would be that he should have due notice and the opportunity afforded to him of removing the bodies and monuments to some other place of his own selection, or that on his failing to do so such removal should be made by others. He accepted the grantor license subject to this necessary condition. In the case cited the authority for the vacation of the burial ground was an act of Assembly; but if a burial ground becomes useless, and the court finds it necessary to abandon and sell the ground in order to continue a charity by the purchase of other ground, then we have a vacation by lawful authority just as imperative as a vacation by a church under legislative permission. The execution of a decree under the act of 1853 is the exercise of a lawful authority, if such decree is lawful."

In Sprogell, no interments had been made in the cemetery for twenty-three years before the petition had been filed and many bodies had voluntarily been removed therefrom. No body remained in the ground that had been buried there thirty years prior to the filing of the petition.

In Touro Synagogue v. Goodwill Industries, 233 La. 26, 96 So.2d 29, the court ordered specific performance of a contract of the sale of real estate owned by the Synagogue and occupied by what the court found to have been an abandoned cemetery. In its decree the court ordered the Synagogue to remove the remains of all persons buried therein and to reinter them in another cemetery used and maintained by it. The court found that the old cemetery had in fact and as a matter of law been abandoned. In describing its condition, the court stated (96 So.2d 33(3)):

"The cemetery in this case has clearly been abandoned. This burial ground has received no interment since 1872 and in its condition of disintegration is presently unfit for this purpose. In addition, the public and the survivors or others interested in its use as a cemetery have failed to keep and preserve it as a resting place for the dead. The premises have been permitted to fall into disorder, the walls to crumble, and the gravestones and monuments to be destroyed so that graves have lost their identity and nothing now remains to stir the emotions or sentiments of the relatives of the dead.

"We can find no justification under the facts established for denying Touro Synagogue the right to sell the property here involved subject to the conditions imposed by the judgment of the court."

In Trustees of First Presbyterian Church in Newark v. Alling, 54 N.J.Sup. 141, 148 A.2d 510, the court affirmed a judgment sought by the trustees in an action described by the court as, "in essence, an application by plaintiff to obtain court approval of a plan to abandon the further use and main-

tenance of the greater part of the cemetery grounds as such, and thereafter use or dispose of the same free of any dedication for burial purposes." 148 A.2d 512. In upholding the judgment, the court stated (148 A.2d 513(1, 2)):

"Aside from statutory authorization for the relief sought (see N.J.S.A. 8:3-8 et seq.), there is no doubt of this court's original jurisdiction to entertain this application. A burying ground or cemetery is affected with a public interest and is a trust. This court has alway exercised supervision and control over cemetery matters."

The proposal approved in that case called for the disinterment of the remains in an old church cemetery and their reinterment in a common grave in a small portion of the original area and a suitable monument to be erected thereon and the area to be maintained in the future by the church. In describing the condition of the cemetery, the court stated (148 A.2d 514(3)):

"The proofs submitted in the matter at hand are persuasive and compelling. No religious question is involved since the application is not in conflict with the tenets, practices, or customs of the Presbyterian Church. The burying ground is no longer used and has not been used since the turn of the century. It is in a dilapidated and run-down condition to a point where it cannot be restored. No one visits the cemetery anymore or indicates any interest in it. No one contributes anything to its upkeep. To attempt to maintain the property with any semblance of respectability would constitute a drain on the income of the church."

In the present case, there was no showing of a situation which would justify the conclusion that Old St. Marcus Cemetery had been abandoned as a cemetery. See Tracy v. Bittle, 213 Mo. 302, 318, 112 S.W. 45, 49–50; Campbell v. Kansas City, 102 Mo. 326, 348–349, 13 S.W. 897, 901–902, 10 L.R.A. 593. There was evidence that a number of the lots had been neglected and that weeds, sprouts and small trees had been

permitted to grow in large areas of the cemetery. However, even in such areas the photographic evidence showed that the grave sites continued to be recognizable as such with many stones in place marking their location and identifying the persons buried therein.

Furthermore, a considerable portion of the cemetery was undoubtedly maintained as such. 2,290 grave sites were under perpetual care contracts and continued to be cared for and maintained by the plaintiff. In addition, the nonperpetual care lots in the vicinity of the entrance to the cemetery had been maintained. The photographic evidence showed that the paths and roadways in the cemetery had been maintained. ■ Inasmuch as this is not a case of prior abandonment of the cemetery, we are confronted with the question of whether or not a court of equity should grant the relief here sought because of the financial burden which the continued maintenance and operation of the cemetery imposes upon the plaintiff. In passing upon this question, we must consider the nature of the obligation from which the plaintiff seeks relief. We have held that plaintiff as the owner of the fee is under no obligation, absent a contractual assumption of such burden, to maintain the lots which have been sold. United Cemeteries Co. v. Strother, 332 Mo. 971, 61 S.W.2d 907, 910, 90 A.L.R. 438. However, the maintenance of the area in which lots had not been disposed of would be plaintiff's obligation. Jackson, The Law of Cadavers, 2d, pages 332–333. Although the area involved is not shown, the evidence did show that some 13,500 of 33,000 grave sites provided in the cemetery were unsold. Furthermore, plaintiff had obligated itself under perpetual care contracts to maintain 2,290 grave sites representing more than ten per cent of the total interments.

The evidence showed that the burden of the latter obligation was actually the source of the loss in the maintenance of the old cemetery which necessitated the transfer to it of funds from the new cemetery. The audit of the operations of the old cemetery from October 1, 1934 to September 30, 1962 showed that perpetual care expenses exceeded perpetual care income during the period by $24,956.32. On the other hand, other operations, including grass cutting, of the old cemetery during the same period resulted in a net profit of $9,552.48. For the period of the audit, income from sales of "service" was $34,775.16 and the cost of sales of "service" was $33,804.04. The accountant who prepared the audit stated that "service" was primarily grass cutting.

■ Thus it appears that the principal financial burden which has been imposed upon the plaintiff was not due to the neglect by lot owners of their obligation, but was attributable to a contractual liability which the plaintiff had assumed. A court of equity may in some circumstances reform a contractual arrangement. However, the mere fact that an obligation has become burdensome affords no basis for relief. As stated in Tamko Asphalt Products, Inc. v. Fenix, Mo.App., 321 S.W.2d 527, 537:

"Many courts have found it appropriate to point out, in a wide variety of situations, that equity vests in the judiciary no broad and unfettered discretion to disturb or alter contractual rights and no carte blanche authority to decree such contractual construction as a court may believe would have been better for the parties; that the aid of a court of equity may not be invoked to avoid or prevent enforcement of a contract, simply because such enforcement may work a hardship upon one of the parties; and that, in the absence of some recognized ground warranting equitable interference, the rights of the parties should be determined by their contract and, as thus determined, should be respected and effectuated."

■ The existence of the contractual obligation of the cemetery owner in this case distinguishes the case from any which has been called to our attention or which we have discovered in which disinterment of all of the remains in an existing cemetery has

**714**

been accomplished with the approval of a court of equity without legislative authorization therefor. In our opinion, no basis has been shown in the circumstances of this case to justify the granting by a court of equity of the relief requested. The considerations of public policy involved in an application such as here presented are properly for the policy making governmental authority and not the judiciary. We do not endeavor to pass upon the question of whether or not the considerations here presented would justify the exercise of the police power by the proper legislative authority to require the abandonment of the Old St. Marcus Cemetery.

◼◼ The appellants on this appeal also complain of the failure of the trial court to hold unconstitutional the ordinance of the City of St. Louis prohibiting further interments in the Old St. Marcus Cemetery. As pointed out above, the constitutionality under the due process clause of such legislation has been upheld by the United States Supreme Court in Laurel Hill Cemetery v. San Francisco, supra. Here the appellants alleged that the ordinance had been enacted at the instance of the plaintiff and was not a valid exercise of the city's police power. Apparently they were endeavoring to attack the ordinance on the basis employed in the Union Cemetery case, supra. However, the appellants offered no evidence in support of their allegation. The ordinance is presumed to be constitutional. Passler v. Johnson, Mo.Sup., 304 S.W.2d 903, 908 (3–7); Kansas City v. Liebi, 298 Mo. 569, 591, 252 S.W. 404, 407(1, 2), 28 A.L.R. 295. We find no basis in this case for declaring it otherwise. We likewise find no basis for the relief sought by way of accounting for the perpetual care fund of the old cemetery. No showing was made by appellants which casts doubt upon the accuracy of the audit report and the account rendered therein of the perpetual care fund.

Insofar as the judgment of the trial court authorized the relief prayed for by the plaintiff in its petition, the judgment should be reversed. Insofar as it denied the relief sought in the defendants' crossbills, the judgment should be affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C. is adopted as the opinion of the Court.

All of the Judges concur.