## UNION CEMETERY ASSOCIATION et al., Appellants, v. KANSAS CITY et al.

### In Banc, November 24, 1913.

1. **ORDINANCE: Reasonableness: Judicial Matter.** The courts of this State have the right to inquire into the reasonableness of any city ordinance, though duly enacted; and are not compelled to accept its enactment by the city as a determination that it is a necessary or reasonable exercise of the police power.

2. ————: **Power of City to Enact.** Kansas City has express authority to enact ordinances to suppress nuisances or to preserve the public health.

3. ————: ————: **When There is Special Statute: Cemetery.** If a cemetery is a nuisance and deterimental to public health, Kansas City has the power by ordinance to stop burials therein, although it was incorporated by a special act of the Legislature which set aside its grounds for a graveyard, and the city charter says its provisions and all ordinances shall be consistent with and subject to the laws of the State. Such special act has no more force and effect than the general corporation law, and if the cemetery had been incorporated under that law, burials could have been prohibited therein in the interest of the public health, if actually dangerous thereto. To abate a nuisance dangerous to the public health is a police power which neither the city nor the State can surrender or bargain away.

4. **UNREASONABLE ORDINANCE: To Suspend Burials in Cemetery.** An ordinance which prohibits future burials or interments of the dead in a certain large and well-established cemetery will be held to be invalid and an unreasonable exercise of the police power, if there is no testimony that the cemetery was in fact injurious or dangerous to the public health, and the facts show that the origin and passage of the ordinance were the results of demands and desires of certain citizens in its vicinity whose real estate would be enhanced in value if said cemetery were in effect abolished and opened up to streets.

5. **APPELLATE PRACTICE: New Issues: Regulation of Cemetery.** The Supreme Court, in a suit brought to it on appeal

in which a certain incorporated cemetery seeks by injunction against the city to have a certain ordinance forbidding further burials in the cemetery declared unreasonable and void, has no jurisdiction to entertain a request, from intervenors who are lot owners in the cemetery, that the court by its decree require the officers of the cemetery to set aside a certain fund for preserving and beautifying the graves and grounds and establishing sanitary sewers, for the reason that no such request was presented to the trial court or is embraced within the pleadings.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

REVERSED (*with directions*).

*Albert R. Strother, Hunter M. Meriwether, Denham & Denham* and *Gage, Ladd & Small* for appellants.

(1) The ordinance is unreasonable and therefore void. Corrigan v. Gage, 68 Mo. 541; Skinker v. Heman, 148 Mo. 355; St. Louis v. Russell, 116 Mo. 257; Cape Girardeau v. Riley, 72 Mo. 220; Tarkio v. Cook, 120 Mo. 9; Zumault v. Air Line, 71 Mo. App. 671; White v. Railroad, 44 Mo. App. 540; Halpin v. Campbell, 71 Mo. 493; Hannibal v. Tel. Co., 31 Mo. App. 33; Dillon, Mun. Corp. (5 Ed.), secs. 589-93. (2) The ordinance, while in the guise of an exercise of the police power, is not so in fact, but is really a blow at vested rights of property, to accomplish an unlawful purpose and is therefore void. State ex rel. v. Ashbrook, 154 Mo. 385; Kansas City v. Hyde, 196 Mo. 506; Lawton v. Steele, 152 U. S. 137; Dobbins v. Los Angeles, 195 U. S. 235; Mugler v. Kansas, 123 U. S. 661; Railroad v. People, 200 U. S. 592; Reduction Co. v. Reduction Works, 126 Fed. 35; Richmond v. Tel. Co., 85 Fed. 26; Allgeyer v. Louisiana, 165 U. S. 591; Cooley, Const. Lim. (7 Ed.), pp. 291-2, 837-8; Matter of Jacobs, 98 N. Y. 110; Watertown v. Mayo, 109 Mass.

319; Austin v. Murray, 16 Pick. 126; Helena v. Dwyer, 64 Ark. 424; People v. Ringe, 197 N. Y. 149; Hume v. Cemetery, 142 Fed. 552. (3) The council had no power to pass the ordinance; the power to regulate does not include the power to oppress, prohibit or destroy. Allowing to the testimony offered in support of the ordinance as a health measure, all the weight which may be claimed for it, the passage of the ordinance was an arbitrary exercise of power far beyond any possessed by the council. State v. Clarke, 54 Mo. 20; State v. DeBar, 58 Mo. 397; State ex rel. v. McCammon, 111 Mo. App. 632; Allison v. Richmond, 51 Mo. App. 136; Ex parte Kelso, 147 Cal. 609; Ex parte Dickey, 144 Cal. 236; Reduction Co. v. Sanitary Works, 199 U. S. 318; People v. Gadway, 61 Mich. 285; In re Hauck, 70 Mich. 396; Town of Cantril v. Sainer, 59 Iowa, 26; Miller v. Jones, 80 Ala. 89; Joseph v. Randolph, 71 Ala. 507; Emporia v. Volmer, 12 Kan. 630; Bronson v. Oberlin, 41 Ohio St. 476; State v. Mott, 61 Md. 297; Reduction Co. v. Sanitary Works, 126 Fed. 35; Safety Gate Co. v. Ashbridge, 116 Fed. 221; Sings v. Joliet, 237 Ill. 311; State v. Marshall, 50 La. Ann. 1166; Frazee's Case, 63 Mich. 396; Freund, Police Power, secs. 517, 521, 525, 530; Babcock v. Buffalo, 1 Sheldon (N. Y.), 317, 56 N. Y. 268; Bridge Co. v. Paige, 83 N. Y. 188; Lawton v. Steele, 119 N. Y. 238; Ex parte Patterson, 42 Tex. Crim. 256; Wyeth v. Board of Health, 200 Mass. 478; Bonnet v. Vallier, 136 Wis. 193; Hume v. Cemetery, 142 Fed. 552; McConvill v. Mayor, 39 N. J. L. 38. (4) The ordinance absolutely prohibits the plaintiff from using its property for the purposes authorized and required by the law of the State, namely, its charter, and is inconsistent with such law and is, therefore, void. Constitution of 1875, art. 9, secs. 16, 17; Hannibal v. Guyott, 18 Mo. 521; Paris v. Graham, 33 Mo. 94; Westport v. Mulholland, 159 Mo. 93; Wood v. Kansas City, 162 Mo. 303; St. Louis v.

Meyer, 185 Mo. 583; Carthage v. Garner, 209 Mo. 702; St. Louis v. Klausmeier, 213 Mo. 129; St. Louis v. Wortman, 213 Mo. 143; State ex rel. v. McCammon, 111 Mo. App. 626. (5) The ordinance is discriminatory in that it does not apply to other cemeteries within the city limits and is therefore in violation of the Constitution of this State and of the United States and void for that reason. Hannibal v. Tel. Co., 31 Mo. App. 23; St. Louis v. Spiegel, 90 Mo. 587; St. Louis v. Russell, 116 Mo. 248; State v. Julow, 129 Mo. 163; State v. Walsh, 136 Mo. 400; State v. Thomas, 138 Mo. 95; State v. Miksicek, 225 Mo. 561; Barbier v. Connolly, 113 U. S. 27; Yick Wo. v. Hopkins, 118 U. S. 356; Crowley v. West, 52 La. Ann. 526; Mayor v. Thorne, 7 Paige, 261; Sanitary Co. v. Health Dep., 61 App. Div. (N. Y.) 106; In re Hong Wah, 82 Fed. 623; People v. Wilber, 198 N. Y. 1; In re Van Horne, 74 N. J. Eq. 600; Lake View v. Tate, 130 Ill. 247; Philadelphia v. Westminster Cemetery Co., 162 Pa. St. 105. (6) The evidence is wholly inadequate to support the ordinance as a measure necessary for the preservation of the public health. Braasch v. Cemetery Assn., 69 Neb. 200; Cemetery Assn. v. McAttee, 27 Okla. 160; Kingsbury v. Flowers, 65 Ala. 479; Dunn v. Austin, 77 Tex. 139; Morton v. St. Patrick's Society, 105 N. Y. Supp. 1100. (7) The charter of the Union Cemetery Association is a valid act of the Legislature of this State, and constitutes a contract with the State, which Kansas City cannot violate. State ex rel. v. Adams, 44 Mo. 570; Scotland County v. Railroad, 65 Mo. 123; Bank v. Kansas City, 73 Mo. 555; College v. Schaefer, 104 Mo. 261; State ex rel. v. Convent, 116 Mo. 575; State ex rel. v. College, 175 Mo. 52; Barry v. Cemetery Assn., 10 Mo. App. 587; State ex rel. v. Cemetery Assn., 11 Mo. App. 570; Home of the Friendless v. Rouse, 75 U. S. 430; University v. Rouse, 75 U. S. 439; Lake View v. Cemetery, 70 Ill. 191. (8) There is in the

charter of Kansas City no express power to pass the ordinance in question. That ordinance is in violation of an express statute of the State. It cannot, therefore, be upheld. St. Louis v. King, 226 Mo. 334; St. Louis v. Pub. Co., 227 Mo. 146; St. Louis v. Packing Co., 141 Mo. 383; Allison v. Richmond, 51 Mo. App. 133; Sings v. Joliet, 237 Ill. 300; Knapp v. Kansas City, 48 Mo. App. 485.

*John G. Park, Henry S. Conrad, A. F. Evans* and *Francis M. Hayward* for respondents.

(1) Under the far-reaching grants of power, Kansas City had authority to prohibit further interments in Union Cemetery. This is an authority conceded to the cities by all the courts of highest rank. Campbell v. Kansas City, 102 Mo. 344, 10 L. R. A. 593; Laurel Hill Cem. v. San Francisco, 152 Cal. 464, 14 Am. & Eng. Ann. Cas. 1080, 27 L. R. A. (N. S.) 260; Laurel Hill Cem. v. San Francisco, 216 U. S. 358; Odd Fellows Cem. v. San Francisco, 140 Cal. 226; Kincaid's Appeal, 66 Pa. St. 423; People ex rel. v. Pratt, 129 N. Y. 72; Coates v. New York, 7 Cow. 604; Young v. Board of Comrs., 51 Fed. 592; Board of Comrs. v. Young, 59 Fed. 109; Charleston v. Baptist Church, 4 Strob. L. (S. C.) 310; Commonwealth v. Fahey, 5 Cush. (Mass.) 411; Iuszkewiez v. Luther, 30 R. I. 570; Humphrey v. Church, 109 N. C. 138; Page v. Symonds, 63 N. H. 20; Craig v. Pres. Church, 88 Pa. St. 52; 5 Am. & Eng. Ency. Law (2 Ed.), 793. The age of the cemetery and the length of time during which it has been used are wholly immaterial. Coates v. New York, 7 Cow. 604; Iuszkewiez v. Luther, 30 R. I. 570. (2) The general welfare clause justifies all proper and necessary police regulations. It must be general, because it cannot be determined in advance what is necessary. St. Louis Gunning Co. v. St. Louis, 235 Mo. 99. The Leg-

islature must determine what police regulations are necessary. Ib. All property is held under the implied obligation that its use shall not be injurious to the community. Ibid. Police regulations enacted in good faith and having appropriate and direct connection with the protection of life, health and property must be upheld. Ibid. Where an ordinance is fair on its face, proof of extrinsic facts is not admissible to show motive. Cem. Assn. v. San Francisco, 140 Cal. 226. (3) Neither the State Legislature nor the municipality can bargain away the police power. St. Louis Gunning Co. v. St. Louis, 235 Mo. 99; Mugler v. Kansas, 123 U. S. 623; Slaughter House Cases, 111 U. S. 746. Neither can by any means preclude itself from enacting legislation forbidding burials in populous communities. Pres. Church v. New York, 5 Cow. 538; Board of Comrs. v. Young, 59 Fed. 96. All contracts for burial and conveyances for cemeteries are subject to the exercise of the police power. Page v. Symonds, 63 N. H. 17; Sohier v. Trinity Church, 109 Mass. 22. (4) After the enactment of an ordinance forbidding burials, the only interest of lot owners is to care for the graves and maintain in dignity the monuments of their dead. Campbell v. Kansas City, 102 Mo. 350; Iuszkewiez v. Luther, 30 R. I. 575. The interest of the lot owner is not an estate in the land. It is a right of limited use for interment only. It is analagous to pew tenancy. Page v. Symonds, 63 N. H. 17; Craig v. First Pres. Ch., 88 Pa. St. 51; Windt v. Ref. Ch., 4 Sandf. Ch., 471. Every lot owner is bound to know that the use of the cemetery may become offensive, and his right of interment must yield to laws for the suppression of nuisances. Went v. Meth. Ch., 80 Hun, 267, 150 N. Y. 577; Coates v. New York, 7 Cow. 585; Kincaid's Appeal, 66 Pa. St. 411; Sohier v. Trinity Church, 109 Mass. 21; Humphrey v. Meth. Ch., 109 N. C. 132; 5 Am. & Eng. Ency. Law (2 Ed.), 791. (5)

No other cemetery in Kansas City is situated similarly to Union Cemetery. No attack of fraud or corrupt influence is made upon the Common Council in the passage of said ordinance. This is a complete answer to the charge of discrimination. State ex rel. v. Gates, 190 Mo. 556; State ex rel. v. Neosho, 203 Mo. 84. The courts will not interfere except in those cases where the ordinance is grossly unjust and oppressive and the result of mere caprice. St. Louis v. Weber, 44 Mo. 550; Skinner v. Herman, 148 Mo. 350; Heman v. Schulte, 166 Mo. 417; St. Louis v. Spiegh, 8 Mo. App. 482; St. Louis v. Liessing, 190 Mo. 464; Darlington v. Ward, 48 S. C. 570. The power to prohibit includes the power to say whether there may be exceptions, and whether permission may be granted to some to exercise the right. St. Louis v. Fischer, 167 Mo. 654; Fischer v. St. Louis, 194 U. S. 361; Commonwealth v. Davis, 162 Mass. 510; Davis v. Massachusetts, 167 U. S. 43; L'Hote v. New Orleans, 51 La. Ann. 93, 177 U. S. 587; Watertown v. Mayo, 109 Mass. 319; Pfleger v. Groth, 103 Wis. 104.

WOODSON, J.—The plaintiffs, the appellants here, who, for convenience, will hereafter be designated by the former appellation, instituted this suit in the circuit court of Jackson county, to enjoin the respondents, who hereafter will be referred to as defendants, from enforcing an ordinance of the city, duly enacted by the common council thereof, and approved by the mayor July 14, 1910, forbidding burials in the grounds of the Union Cemetery, a corporation duly incorporated under the laws of this State, by a special act of the Legislature, approved November 9, 1857. [Laws, 1857 (Adj.), p. 320.]

In order to fully and properly understand the positions of the respective parties to this suit, it will be

necessary for us to set forth both the act incorporating the cemetery and the ordinance prohibiting further burials therein.

Said act of the Legislature reads as follows:

"*An act to incorporate the Union Cemetery Association.*

"1.   That James M. Hunter, Edward T. Peery, Joseph C. Ranson, William R. Bernard, Robert J. Lawrence, and Milton J. Payne, and their successors forever, be, and they are hereby created a body politic and corporate, by the name and style of the 'Union Cemetery Association;' and by that name have perpetual succession; sue and be sued; plead and be impleaded; defend and be defended in all courts in this State; and in like manner to have and use a common seal, which they may alter or change at pleasure; to make such by-laws and regulations for the good government of the corporation, and the efficient management of its affairs, as they may deem necessary; provided, the same are not inconsistent with or repugnant to the public law of the land.

"2.   In addition to the tract of land now held or owned by the said corporation for a cemetery or graveyard, they shall have power to buy and hold any number of acres, not exceeding one hundred and sixty, for that purpose; may lay off the same, or any portion thereof, into lots and subdivisions suitable for graves, vaults and monuments; may embellish the same with trees, shrubbery, and flowers, or cause the same to be done by any purchaser thereof, and lay out avenues and walks; and when so laid off and dedicated, shall be forever held by said corporation for the purpose aforesaid, and none other; said corporation may sell and convey any of the lots or subdivisions in said cemetery for the purpose aforesaid, subject to such condi-

tions as may be prescribed by its by-laws; and every right sold and conveyed shall be held and used by the purchasers thereof, for the purposes aforesaid, and none other, and shall not be subject to attachments or sale under execution, nor by order of any court, or be conveyed by the owner out of his family after any interments have been made in said lot.

"3. The officers of said corporation shall be a president, secretary and treasurer, who shall be elected every year, out of the said board of corporators; and said corporators may appoint such other officers as the board may deem needful, and prescribe the duties and terms of office; they shall also keep a faithful record of their proceedings, copies of which, certified under the seal of the corporation, shall be received as evidence in all courts in this State; the first election shall be held on the first Monday in May A. D. 1858, and every year thereafter, at the City of Kansas. Milton J. Payne, President, and William R. Bernard, Secretary and Treasurer, who are now the chosen officers of said corporation, shall hold their offices until the first general election, and until their successors are duly elected; and as such officers, are empowered to do and perform all the acts and things imposed on them by this act, and all vacancies that may occur in said board shall be filled in such manner as the board may determine in their by-laws.

"4. The president shall, at the request of any two of the corporators, call together a meeting of the board; shall preside at all meetings, and do all other acts and things imposed on him by the rules and regulations of said corporation.

"5. All deeds for the conveyance of lots or subdivisions, or certificates of shares of stock in said cemetery, shall be signed by the president of said corporation, and attested by the secretary, with the seal of

the corporation attached; and the further certificate of the secretary that the president executed the same shall be deemed a sufficient authentication of said deed in all courts and places whatsoever, and may be recorded with like effect of other recorded deeds.

"6. It shall be lawful for said corporation to hold any grant or bequest of money or property, in trust, and to apply the same, or the income thereof, under the direction of said board, for the improvement of said cemetery, of any portion thereof, or in the erection of any tomb or monument, according to the terms of any such grant or bequest.

"7. Any person who shall willfully destroy, injure or remove any tomb or monument, or any gravestone placed in said cemetery, or shall wilfully remove, destroy, cut, break or injure any fence around, or railing, fence, tree, shrub or plant within the limits of said cemetery, or shall wilfully ride or drive any beast at an immoderate gait, or shall ride or drive over any lot or grave, or shall turn loose any animal in said cemetery, or shall shoot or discharge any gun or other firearms within the said limits, shall be deemed guilty of a misdemeanor; and upon conviction thereof before any justice of the peace, or court having jurisdiction of misdemeanors in the county of Jackson, shall be fined not less than five nor more than fifty dollars; and such offenders shall also be liable to an action of trespass, before a justice of the peace or court of competent jurisdiction, in the name of the corporation, to recover all damages occasioned by such unlawful act or acts; and all money recovered either for a misdemeanor or for trespass, shall be appropriated in the reparation of the property injured or destroyed, and in the embellishment and improvement of the grounds; and in all such suits members of the corporation shall be competent witnesses.

"8.  Any person who shall willfully open any vault or grave within the limits of said cemetery, for the purpose of unlawfully taking therefrom anything placed with the corpse therein, or who shall remove any body from said cemetery, for the purpose of dissection or any other unlawful purpose, or who shall knowingly receive any such body after the removal, and also all aiders and abettors, shall be deemed guilty of a felony; and upon conviction shall be punished by imprisonment in the penitentiary not less than one nor exceeding three years.

"9.  Said cemetery shall be exempt from all taxes and assessments so long as the same shall remain dedicated to the purposes of a cemetery; and it shall not be lawful for any public road, street or highway to be ever opened through the cemetery grounds, without the consent of the corporators; nor shall the Legislature ever authorize the same.

"10.  For the purpose of better effecting the objects contemplated by the seventh and eighth sections of this act, the said corporators shall have power to appoint a bailiff, whose appointment shall be confirmed by the county court of Jackson county; said bailiff shall be authorized, in a summary manner and without process, to arrest and take before any officer or tribunal having cognizance of the offenses mentioned in said sections, any person or persons who shall have perpetrated, or be in the act of perpetrating, or be about to perpetrate any of the acts or offenses intended to be prohibited by said sections, to be dealt with according to law; and for that purpose may summon, peremptorily, any person or persons to his assistance.

"11.  This act is hereby declared a public act, and shall take effect from and after its passage."

The ordinance complained of is as follows:

*"An ordinance prohibiting burials within certain limits of Kansas City, Missouri, and prohibiting the Board of Health from issuing any permits for burials within such limits.*

"Be it ordained by the Common Council of Kansas City:

"Section 1. There shall be no burials or interments of any deceased person in Kansas City, Missouri, within the territory of boundaries included within the following limits:

" 'Beginning at the intersection of Thirty-ninth street and Woodland avenue; thence west to the State Line; thence north to the Missouri river; thence east along said river to Woodland avenue; thence south to Thirty-ninth street.'

"Section 2. No sexton or any other person in charge of any cemetery or burying ground within such limits shall receive the body of any deceased person for burial within such limits nor shall the board of health issue a permit for. the burial of any body in any cemetery or burial ground within such limits.

"Section 3. All ordinances, or parts of ordinances, in conflict with this ordinance, are, insofar as they so conflict, hereby repealed."

The property and grounds of the cemetery, at the date of its incorporation, were located beyond the limits of Kansas City, but at the time of the passage of the ordinance in question the limits of the city had been so extended that they embraced all of said property.

The following plat of the grounds of the cemetery, introduced in evidence, will materially assist the reader in understanding the facts and legal questions discussed and disposed of in this case:

No complaint has been lodged against the sufficiency of the pleadings (except in reference to certain rights claimed by certain of the lot owners, in the cemetery, which will be considered later), and for that reason we will, for the present, put the pleadings aside, with the observation that they sufficiently tender the various issues presented and discussed by the parties to the suit.

The evidence for the plaintiffs tended to prove that the cemetery embraces forty-nine acres of land, situated within the present limits of Kansas City. Forty acres thereof were purchased May 19, 1857, some six months prior to the incorporation of said cemetery, which subsequently was duly conveyed to that company.

On April 15, 1858, the cemetery, by its president, signed, acknowledged and filed with the clerk of the circuit court of said county, a plat of said forty acres, entitled, "Union Cemetery for the Cities of Kansas City and Westport," which plat, heretofore set forth, shows that only about one-half thereof was laid off into lots and subdivisions suitable for burial purposes at that time.

The fifteen acres more or less, hereinafter mentioned, as unoccupied and unlaid-off land, fronting on Main street, is a part of said original forty acres.

Shortly after the incorporation of the cemetery, it purchased two other small pieces of ground aggregating about nine acres, making its present holdings about forty-nine acres.

Said land is bounded as follows: On the north by Twenty-seventh street, on the south by Twenty-ninth street, on the east by . . . . . . and on the west by Main street.

On the date of the institution of this suit, about fifty thousand burials had been made in said cemetery; and in the five years preceding the trial, there had

been about five thousand interments made therein, or about eighty-five per month.

In the year 1910, sixty per cent of the burials outside of the potter's field were made in ground newly purchased from the county for that purpose.

Many of the old settlers of Kansas City and Jackson county are buried therein, among whom are General George C. Bingham, William Gillis, Judge Samuel H. Woodson, the family of Col. R. T. Van Horn, and many others; also about one thousand United States soldiers; most all of whose graves are marked by a monument or a marble headstone, some of which are very expensive.

Judging from the evidence introduced, and somewhat from my personal knowledge of the values of lands in that locality, and the expenses of burials, I would say that the present value of the lands of said cemetery is about $500,000, and were it not for the presence of said cemetery the value thereof would, in all probability, be at least three times that amount; that the cost of the interments therein, including everything necessary thereto, is about five millions of dollars, and that the cost of the monuments and headstones is not much less than one-half of the latter sum —all included equal an outlay of probably seven or eight millions of dollars. (This is a rough estimate.)

.The Union Cemetery is the only one embraced within the limits of the ordinance complained of, but there are, however, three other cemeteries within the corporate limits of Kansas City, namely, Elmwood, Mount St. Mary's, and St. Peter and St. Paul's.

Woodland avenue is the eastern boundary of the territory described in the ordinance complained of, and the Cemetery of St. Peter and St. Paul lies only five hundred and twenty feet east of that line.

Mount St. Mary's Cemetery contains forty acres and has buried therein ten thousand bodies, with a

monthly interment of about fifty; Elmwood contains about forty-four acres, and has buried therein twelve thousand, with a monthly interment of about forty-five, and St. Peter and St. Paul's contains about ten acres and has about two thousand burials, and a monthly interment of only five or six.

The three latter cemeteries were opened up for burials in the order stated, namely, in the years 1887, 1872 and 1877.

The comparative density of the population of the territory contiguous to those cemeteries was shown.

"In a strip of ground 600 feet wide contiguous to the exterior boundaries of these cemeteries, the number of buildings with the length of the exterior boundary of each cemetery are as follows:

"Union Cemetery:

  "300 buildings.

  "Length of exterior boundary of cemetery, 5660 feet.

  "5.3 buildings to each 100 feet of boundary.

  "95 per cent of the buildings are residences.

"Mount St. Mary's Cemetery:

  "390 buildings.

  "Length of the exterior boundary of the cemetery, 4320 feet.

  "7.3 buildings to each 100 feet of boundary.

  "The buildings are practically all residences.

"Elmwood Cemetery:

  "231 buildings.

  "Length of exterior boundary of cemetery, 5400 feet.

  "4.3 buildings to each 100 feet of boundary.

  "80 per cent of the buildings are residences.

"St. Peter and St. Paul's Cemetery:

  "377 buildings.

  "Length of exterior boundary of cemetery, 2480 feet.

  "15 buildings to each 100 feet of boundary.

"The buildings are mostly residences."

There are twelve or fifteen acres of ground not yet encroached upon by graves in the Union Cemetery, which in fact is the bone of contention in this case, and were it not for this fifteen acres, this case would never have been here.

There is also in different parts of the cemetery where lots have been sold, vacant and unsold ground suitable for graves. There is also, in lots already sold, unoccupied room for 3600 graves; the vacant spaces in these lots representing, at present prices, a value of $35,000 or $40,000.

The inspiring cause for the passage of the ordinance is not difficult to discover. Certain persons living or owning property in the neighborhood of the cemetery, and particularly south of it, deplore its presence there because they regard it as a partial obstruction to the progress of improvement and growth in the direction of their own holdings, and therefore as preventing them from realizing the additional values which they think their own property would possess if the cemetery was not there. They also do not like it because the property is, by the provisions of section 9 of the charter of the Association, exempt from taxes and assessments, and because by the same section the opening of any street, road or highway through the ground is forever prohibited, without the consent of the incorporators. They think streets ought to be opened through the property, and they are also irritated because it has been held by the courts, in obedience to the mandate of a legislative act, that taxes cannot be assessed against the property; these people think that this property ought to be taxed like other property, notwithstanding the Legislature has declared otherwise. Many of the principal witnesses for the defendant were persons of this class.

That the ordinance complained of is unreasonable and oppressive, and was not enacted for the health,

comfort or well-being of the city, but was passed at the instigation of, and for the benefit of persons residing or owning property in the neighborhood of the Union Cemetery and particularly south of it, who believe and contend that its presence obstructs and impairs the progress of the city, delays improvements and retards its growth in the direction of their holdings, and thereby prevents them from realizing the additional values which they think their property would bring if the cemetery was not there; also wish the cemetery abated because section 9 of the act incorporating it, exempts its real estate from all taxes and assessments, and because the same section forever prohibits the opening of any street, road or highway through or across said lands without the consent of the incorporators. That they caused the city council to believe that streets should be opened through said property and that the same should be taxed and assessed for benefits received by improvements made by the city, just the same as other property in that vicinity is taxed and assessed, notwithstanding it is expressly exempt therefrom by the act of incorporation.

There were many witnesses who so testified at the trial; also that they presented petitions to the Common Council embodying those views and stating that the "continued use" of said property for cemetery purposes was greatly detrimental to the property interests of that section of the city; that "the expansion of Kansas City is injured by the fact that Union Cemetery lies exactly in the path of the city's greatest development. Its continued use as a cemetery, in the heart of the city, is not only against property values, but against public welfare, as recognized in every community." One of the petitions so presented urged as a reason for the abolition of the cemetery that "being in the vicinity of the new Union Depot, it is a drawback to the progress of the Twelfth (12th) Ward."

·That Main street, which lies to the west of the cemetery, rises pretty steeply to the south until it reaches Thirtieth street, and from there going south, it descends for a distance of two or three blocks with the result that it makes a long, stiff pull up hill, for loads going south, and this point has become known and designated as the "Main street hump," by persons who are in favor of cutting Main street down at Thirtieth street, and for some distance both north and south thereof

That the ordinance complained of was introduced in the council in response to the importunities of said witnesses and in obedience to said petitions. That during the pending of said ordinance in the council, the press of Kansas City advocated its passage for the reasons mentioned, and not as a public regulation, for the benefit of the health and well-being of the city.

Among the articles so published, the following have been selected from the Star, one of the leading papers of the city, and of the United States:

## "EAGER TO MOVE THAT HUMP.

"One Main Street Property Owner is Ready to Pay Thousands."

And in the body of the article:

"The subject under consideration by the committee was not the hump. It was the ordinance to bar future burials in Union Cemetery. This will make possible the improvement of Main street as a traffic way to the South Side, and that is how the discussion drifted to the subject of the hump."

And in the article one of the spokesmen is reported as saying:

"I am one who believes in doing things the right way. In addition to reducing the grade of the Main street hill, we should widen the street on the side of the cemetery."

And others said that the cemetery had become "an impediment to the city's growth and improvement."

In the same paper, the day after the ordinance was passed by the Upper House of the Common Council, appeared an article stating that among the reasons given for the passage of the ordinance was the fact "that a large part of the cemetery on the west side is unused and is an impediment to improvements in the vicinity of the new Union Station."

In the same article it also said of the signing of the ordinance by Mayor Brown:

"He [Mayor Brown] also was influenced, he [Mayor Brown] said, by the fact that a large part of the cemetery, unused, escapes taxation that falls entirely on abutting property owners."

In another article in the same paper, appearing the day after the approval of the ordinance by the mayor, it is said:

"It [the cemetery] also is an impediment to improvements in that vicinity because the ground, including that not used for burials, escapes taxation and cannot be used for streets.

"The enactment of the ordinance will clear the way to widen Main street and to open Grand avenue or Walnut street through the unused ground. This part of the cemetery property will become valuable when put on the market, and will have to bear its share of the cost of improvements in that neighborhood."

On the day this action was brought, the same paper, in giving an account of it said:

"The city ordinance prohibiting future burials in a district including Union Cemetery, was passed by the council July 14. Its purpose was to make an unoccupied part of the cemetery subject to special taxes and public improvements."

And on the evening of March 24, 1911, the day on which the trial of this cause began and while the trial was in progress, the same paper said:

"All semblance of reason for the rule fails in such a case as that of the Union Cemetery Association of Kansas City. . . . The powers to tax and exercise the right of eminent domain are powers of sovereignty. The powers to avoid taxation and to block a right of way for a public use are equally sovereign. Sovereignty belongs of right only to the public as a trustee for the public. That land held by a burial association, existing for profit accruing by several avenues of business activity, should be exempt from general taxation and from assessments for special betterments is an unreasonable and inequitable thing. That the association should be able to block essential public improvements and continue its financial energies in derogation of public welfare, and do these things in the name of a consecrated privilege, would be a yet more unjust anomaly."

The plaintiffs introduced much evidence as to the physical and sanitary condition of the cemetery.

Charles Johnson, the superintendent of the cemetery, and in fact, witnesses for both the plaintiffs and defendants, testified that from five to twelve men were employed therein; that the grass was cut several times a year in the summer months by scythes, it being impossible, on account of the plat of the cemetery, to use machinery for that purpose; that the monuments were straightened up, sunken graves were filled and trees and shrubbery were trimmed several times annually.

That there were some pools of water located in the north end of the cemetery, caused by excavations of rock which had been made for the purpose of filling with earth, so the ground could be used for burial purposes; that said pools only existed for short periods during the rainy seasons; that blue grass grew there, and that those depressions were being filled with

earth and would be completely filled within three months.

That for a considerable distance north of the cemetery the land is low and broken, and the water during the rainy seasons sometimes stands there, which is the result of the drainage, principally from causes other than the cemetery land.

Johnson, the superintendent, who was a witness for the plaintiff, testified that he had never seen the cemetery in an unsanitary condition.

Several witnesses whose families are buried in that cemetery, testified as to the condition of the same.

Among them was Ex-Mayor J. J. Davenport, who testified that the conditions in the cemetery were good, but on land outside of the cemetery the conditions were bad; that there were no pools of water standing in the cemetery; that this cemetery was not as well kept as some he had seen in other cities, naming them from an artistic point of view, but from a sanitary standpoint, nothing was wrong with it; and that there were no hygienic reasons for closing the cemetery.

Dr. Stephen H. Ragan, a practicing physician in the city, who lives not far from the cemetery, fifteen or twenty members of whose family are buried there, including his grandfather, his father and his wife, who has been a visitor there weekly and sometime two or three times a week for many years, says that, aside from the roads, the cemetery is in a fairly good condition; the ground is hilly and the rains wash the gravel out of the driveways. He has never seen anything there which was in the least unsanitary or dangerous or deleterious to health.

Mr. J. Lee Porter, whose ancestors for three generations are buried in the cemetery, testified in substantially the same way.

Mr. O. R. Welch, an expert civil engineer of many years' residence in the city, described the topography

of the property from actual examination and survey, and testified that:

The south part of the cemetery ground is on the highest level; from there it slopes through its entire area to the north and east; there are two small draws in the ground running in a general northerly direction and they unite near the northern end of the cemetery; they carry off the drainage, and eventually the drainage reaches O. K. creek, which lies about one-half to three-fourths of a mile to the north, runs west and finally empties in the Kaw river. O. K. creek, although a small natural stream, is virtually nothing more or less than a sewer, used by the city as such; for part of its distance it is open, for a part, enclosed. It receives the drainage not only from the cemetery, but from lands between it and the cemetery which slope, on the one side to the east, and on the other towards the west, both slopes terminating in a natural north-and-south depression with its slopes in a general northerly direction toward O. K. creek. The ground north of the cemetery to O. K. creek is rough, ragged and broken. Much stone has been excavated from it. Because of the jagged and unfavorable character of the territory north of the cemetery, there are many more houses, in proportion, to the south than to the north of the ground. The plaintiff has a twenty-inch sewer in the cemetery which carries off the surface water, and the water from a spring in the grounds in the direction of the natural course of drainage. There is no underground system of drainage, neither is there any in any other cemetery in the city. There is no sewer in St. Peter and St. Paul's Cemetery.

The drainage of the cemetery is taken care of in very much the same manner as that of other cemeteries in the city. The drainage from Mount St. Mary's Cemetery and also from Elmwood Cemetery, flows into a creek known as Gooseneck creek. Gooseneck creek, like O. K. creek, serves the purpose of a sewer. It is

enclosed part of the way. It runs east instead of west and empties its waters into the Blue river near Sheffield, a thickly populated neighborhood within the city limits.

In the north part of the cemetery, rock has been excavated to the extent of nearly five acres. The last excavating was about three years before the trial. This was done because the rock came to the surface, or there was so little soil that it was not regarded, in its existing condition, as adapted for burials. The excavating was done for the purpose of fitting it for burial ground, and the company, since the completion of the excavation, has been filling it with clean dirt so as to render it suitable for graves, and at the time of the trial it was expected that the filling would be finished in about three months. The company sold the rock so excavated. The pools referred to by some of the witnesses were in depressions caused by these excavations and when the filling of them is completed will cease to exist.

The potter's field is in the northeast part of the cemetery; there are about two acres in it. Persons are buried very close there. In the year 1910 there were buried in the cemetery 1363 persons of whom 406 were paupers and were interred in the potter's field. The cemetery company receives no pay for the ground occupied by these graves. No paupers are buried either at Elmwood or at Mount St. Mary's.

Maps were exhibited by the plaintiffs, showing from the records of the board of health the location of every case of diphtheria, typhoid and scarlet fever in the city during the years 1909 and 1910. There was no undue proportion of cases in the neighborhood of Union Cemetery, and much less than in some sections of the city.

That the neighborhood in which Mount St. Mary's Cemetery is situated is all built up; almost without exception the buildings are residences and they are

practically all occupied. That neighborhood is bet-
ter built up than is the one around Union Cemetery.

That the territory in the neighborhood and sur-
rounding St. Peter and St. Paul's Cemetery is almost
exclusively a residence section; it is densely popu-
lated.

And the same is true of the neighborhood sur-
rounding Elmwood Cemetery.

As to the contiguity of business houses to Union
Cemetery, the evidence showed that there were a few
as far north as Twentieth street, but from Twentieth
to Thirtieth street on Main and Grand avenue there
were scarcely any. On Main, from Thirtieth to Thirty-
third street, there were quite a number of retail houses,
and on Thirty-first street there were some. The en-
trance to one of the public parks of the city is across
Main street nearly opposite the northwest corner of
the cemetery; it is about 600 feet from the south line
of the cemetery before any business houses are reached
at Thirtieth street and a half mile from its north
line to any considerable number of business houses on
Grand avenue.

That no complaints were ever made of an unsan-
itary condition of the cemetery. Dr. Cross, the official
city chemist, a witness for the defendants, testified
that during the time he had held that official position
he had never heard of any complaint relating to the
condition of the cemetery.

Dr. Carl A. Jackson, a witness for the defendants,
a member of the Common Council, chairman of one
of its sanitary committees, and for three and one-half
years immediately preceding August, 1908, health offi-
cer of the city, said that while he was such health
officer he never heard any complaint as to the sanitary
condition of the cemetery.

And Mr. John F. Ward, the alderman from that
ward, although his business and residence for four
years had been within a block and a half of the ceme-

tery, testified that he never knew or heard that anything was wrong with it until this ordinance was introduced. This was in June, 1910, and the ordinance passed in less than a month. He said he was simply working for "my people that I am representing," and he regarded the cemetery as "a drawback to that end of Kansas City."

In this connection, the plaintiffs introduced in evidence that provision of the city charter creating the hospital and health department, which places it under the management and control of a hospital and health board composed of three members, who must "be selected with reference to special fitness for the position," with an executive officer known as the Health Commissioner, who must be a physician. This board is given full power and control over matters relating to the public health of the city; is vested with large powers and charged with important duties. Among other things it is within its powers and is its duty to regulate the sanitary condition of cemeteries within the limits of the city, and to recommend to the Common Council the passage of such ordinances as it may deem necessary for the preservation of the public health. Regarding this cemetery no recommendation was ever made by it or to it, none of its members appeared as a witness in this case; even the Health Commissioner was not a witness, although he is a defendant in the proceedings.

The plaintiffs introduced much more evidence of the same general character as that heretofore mentioned.

The defendants introduced evidence tending to show the unsanitary condition of the cemetery, in order to justify the passage of the ordinance as a police measure in the interest of the public health.

Dr. Horigan, the principal witness for the defendants, testified that he was a physician and owned the property on Main street at the corner of Thirty-first,

two blocks south of the Union Cemetery. That he was one of the persons who signed one of the petitions to the common Council, asking the passage of the ordinance complained of, for the reason "that the expansion of Kansas City is injured by the fact that Union Cemetery lies exactly in the path of the city's greatest development," and that "its continued use is greatly detrimental to property interests in that section of the city," and is "against property values."

That in his opinion "Union Cemetery is in a very unsanitary place." That he had observed pools and ponds of water on the north side of the cemetery, and that in his opinion it was in an unsanitary condition. Disease germs are buried with the dead, and if bodies are not buried deep, or if the watershed is such that water carries the germs and distributes them to the living, sickness and death result. Germs are usually carried in two ways; through water supply or by means of rats, mice, flies and domestic animals. That the drainage of Union Cemetery into pools and ponds to the north side of the cemetery is unsanitary; that the blue scum over these pools and ponds indicate bacteria and disease—breeding germs, which may be widely scattered. That he selected the ground on the west side of Main street, within three hundred feet of Union Cemetery, and there built St. Mary's Hospital, the largest and most modern in the city in which he keeps and treats his sick patients, about two hundred in number. And when asked why he built his hospital there, if it was so unhealthy, he answered that it was convenient for burial purposes in case any of his patients should die. That he did not know that there were actually any germs in the pools mentioned or that any disease had been caused thereby.

S. W. Henderson testified that he owns property on Main street, near the corner of Twenty-ninth, on which he has run a grocery for twenty-five years. He owns property on Twenty-ninth street immediately op-

posite the cemetery on which he has lived for several years, and was also a signer of both the petitions already mentioned, although he had forgotten the fact, and at his store meetings upon the subject were held, although he had also forgotten that, and he has been trying to get the cemetery closed up in order to get the streets improved. "Smelt things," he said. "Why, just the other day I thought I smelled something." . . . "I often question myself where that smell came from." He thought "it must be some sewers, or something like that, or somebody must be opening a vault or some thing like that;" he thought "somebody was opening a vault or cleaning one out;" he had been smelling things "for six or seven years;" that it did not seem to him like the smell of the packing houses. He said the smell came from the north and northeast.

W. B. Mumford, who kept a drug store for about a year on the corner of Twenty-ninth and Main streets, also smelt something. He was perfectly satisfied that it came from the cemetery; there was "a sickening, disagreeable odor all the time from that section." But when he went into the cemetery itself, he did not notice that smell.

A. F. Lawrence, who has lived in Union Cemetery for five years and still lives there and who had a quarrel with the superintendent, worked in the cemetery for a month about four years ago. He has "noticed a smell or scent whenever it is damp." But he still continues to live in the cemetery and proposes to stay there.

L. S. Bender worked in Union Cemetery three years ago for about three months, digging graves. When asked if he observed a stench or smell in the graveyard, while he was working there he said, "Well, it seemed as though at times I would, yes." When asked if the smell was like the smell of the packing houses, he said he didn't "know as it was, something

similar to, you might say, in some ways; in some ways it was and in some ways it was not.''

"Joe" Johnson, an attorney, also went through the cemetery twice; one time with Mr. Ward and Mr. Jesserich and others, in August before the trial. He says when they went through "there were noxious smells.'' He lived for twenty-four years at 2917 Baltimore avenue. This is one street west of Main street. He moved away October 12, 1910. He said his wife was sick all the time they lived there, and since they moved away she had gained fifteen pounds, in six months. He said some of his neighbors had been sick for years, and they laid it to the cemetery. He did not know whether that was true or not.

C. K. Bowen, a photographer, took a number of photographs in Union Cemetery, as evidenced by Exhibits 22 to 26 inclusive in evidence. In doing so, he was over the cemetery grounds and knows that the photographs correctly portray conditions in said cemetery. He saw a portion of a coffin in the cemetery grounds, as well as a collection of human bones collected from the surface thereof; saw pools of water, over which there was a scum and green stuff which had a terrible odor, and on two acres of the cemetery the graves and headstones thereof were as close together as could be, seemed to be touching one another. Some headstones were decayed, others down on the ground. Some of the graves were sunken a foot or two, and in at least a half dozen places in the potter's field, rubbish, tombstones, and headboards were piled up; that part of the cemetery in the district of the potter's field and west of it, showed no evidences of care. That he took the photographs introduced in evidence showing the physical condition of the cemetery. That he had been a witness for the city in a thousand cases, in which his works of art were used as evidence (and from this I suppose he acquired the name "Artist" Bowen, by which name he is referred to many times throughout

the record). That he was instructed "to make the situation the best of my ability," and that he obeyed instructions. That he furnished one of his assistants with a long weed, to resemble a fishing pole, to which he tied a string, and placed said assistant at the edge of one of the pools in the attitude of fishing, which is shown by one of the photographs offered in evidence. That in order to please his employer he arranged the headstones to suit his own notions, which appears in one of the pictures. That he "kicked" out of the ground a piece of a board which was said to have once been part of a casket, which was done to make it appear in the picture. That he gathered together a small collection of what were said to be human bones, which were offered in evidence. That he picked them out of the ground with a little stick.

Dr. LeRoy Dibble, a physician and surgeon, with forty-two years' practice, had been one of the sanitary officers of the State of Michigan, and a prison inspector for nine years and had been twice through Union Cemetery, saw human bones scattered on top of the ground. He observed the drainage of the cemetery and the pools which, being filled with germs, might be carried by mosquitoes, rats and mice, and be the cause of disease and distributed over a considerable area, and with conditions as described in the potter's field, if the ground became thoroughly saturated, would be a danger always and that the existence of stenches and smells was a warning of an unsanitary condition and a danger.

Dr. Walter M. Cross, a physician and surgeon and a chemist by profession, is the city chemist of Kansas City. He testified that pools of water covered with a scum might be the cause of the spread of disease; that disease germs might be spread by vermin, flies, rats, etc.; that the condition observed in the potter's field, considering the drainage of the cemetery, is an

unsanitary condition and the probable source of the spread of disease; that germs which have once destroyed human life are probably thousands of times more virulent than before.

Dr. Carl A. Jackson, a physician and surgeon, was a member of the lower house of the Common Council of Kansas City and chairman of the Sanitary and Hospital Committee. He testified that germs are carried by vermin and mosquitoes.

J. D. Bateman lived near the cemetery and had been in the cemetery. A house and barn appeared therein. Hay was stacked within the cemetery. Grass had grown long enough to be cut for hay. He made measurements of distances to top of caskets from the surface of the ground which averaged from three feet to sixteen inches.

Joseph S. Chick, Jr., whose father came to Kansas City in 1836, and had buried many members of his family in Union Cemetery, assisted in moving bodies of the family from the cemetery and testified the caskets were very muddy.

A. F. Lawrence testified for defendants, that he had been living in the cemetery for five years and worked there for a time; and that in digging graves in the potter's field, they sometimes found bones in the bottom of the newly dug graves.

H. A. Close testified for defendants, that he had been a grave digger in the cemetery for more than five years and still worked there, said that in the potter's field they struck human bones once in a while when digging graves; and in such cases the bones so found were always put in the bottom of the grave before the new coffin was put in. A place was excavated to accommodate them. He never saw any human bones there on the surface; only saw them where he was digging and then he put them back.

And L. S. Bender, another witness for the defend-
ants, who worked in the Union Cemetery as grave dig-
ger about three years before the trial, testified that
when, in digging graves, they found bones, they col-
lected them together, then dug down a little deeper
at one end of the grave and put them in that excava-
tion and put the new box on top. This was in the
potter's field. But the pieces of coffin so found are
not reburied; they are burned.

Defendants also introduced evidence whose pur-
pose was to prove that the cemetery did not receive
from its owners proper attention; that it was not as
trim, and neat as it should have been, and that its
appearance suffered from want of proper care. One
witness testified that he was there in March, and the
grass looked as if it had not been cut for some time.
He had only been in the cemetery twice.

Another witness said that in the potter's field the
grass looked as though it had not been taken care of
through the entire summer. He was one of the party
who went into the cemetery and drove a sharp steel
rod into the graves, to ascertain how deep they were
buried.

Henderson, another witness, whose testimony on
other points has already been referred to, described
everything as "wild looking, in a wild, chaotic condi-
tion:" . . . "I don't think they spent five cents a
day on it." His visit was on the Monday before the
trial began. Henderson saw pools of water there, "and
weeds and reeds and brush, and everything like that,"
in the north end of the cemetery; and he saw green
scum.

Such additional evidence as may be necessary for
a proper presentation of the law and facts of the case
will be mentioned in connection therewith, in the opin-
ion which is to follow.

I. There are many questions of fact and proposi-
tions of law presented and ably discussed by counsel
for the respective parties to this suit; but after all,
when reduced to their final analysis, they
Reasonable tender a simple controverted fact for de-
Ordinance:
Suppression termination, and that is, is the ordinance
of Cemetery. which was duly enacted by the Common
Council and approved by the mayor of
Kansas City, on July 14, 1910, prohibiting further bur-
ials within the territory embraced within the terms of
that ordinance, reasonable or unreasonable?

If that question is to be answered in the affirma-
tive, then it will become the duty of the court to hold
that said ordinance is valid and binding upon all par-
ties concerned, while upon the other hand, if we should
answer that question in the negative, then it would
equally become the duty of the court to hold said ordi-
nance invalid and inoperative.

Preliminary to a disposition of that question it be-
comes necessary for the court to determine a certain
legal proposition interposed by counsel for defend-
ants, as a barrier against the right or authority of
the court to inquire into the question of the reasona-
bleness or unreasonableness of the ordinance in ques-
tion.

Counsel for defendants insist that the law con-
clusively presumes that the Common Council of Kan-
sas City, which is the legislative body thereof, fully
investigated the conditions that existed in and about
the Union Cemetery, and the effect those conditions
had upon the public and the health of the city; that it
must have found that further burials in said cemetery
was detrimental to the public health; and that in the
exercise of the police power of the city it enacted said
ordinance to preserve the health and well-being of the
city.

In support of this insistence we are cited to several provisions of the city charter and adjudged cases from this and other States.

Without stopping to review those authorities, it is sufficient to say that, whatever may be the rule in other States, in regard to that matter, it is fully settled and it is no longer an open question in this State, that the courts hereof have the undoubted right to inquire into the reasonableness of any ordinances, though duly enacted, by any and all cities of this State.

This question was ably presented to this Court in Banc, in the case of the American Tobacco Company et al. v. the City of St. Louis et al., 247 Mo. 374, involving the reasonableness of an ordinance separating the railroad and street crossing at Tower Grove Park and other points in that vicinity. After a careful review of all the authorities the court unanimously held, in conformity to its previous rulings, that the courts of this State possess the power and authority to investigate and pass upon the reasonableness of any ordinance enacted by any city, town or village in this State.

Counsel for defendants have not shown or suggested any good reason why the ruling of this court in the case mentioned, which is in harmony with the previous rulings, should be departed from or changed. Nor have we, in the investigation of this question anew, discovered any substantial reason which would justify a departure from that ruling.

We, therefore, rule this insistence against defendants.

II.   Counsel for appellants present a counter contention to that presented by counsel for respondents in the preceding paragraph of this opinion, namely: Although it be conceded that the Legislature of the State might have the power and authority to enact a valid law prohibiting the Union Cemetery from burying dead bodies therein, nevertheless, Kansas City had

no such authority under special provisions of her charter or under the general welfare clause thereof, and therefore the ordinance complained of is null and void.

The special charter provisions so far as they are material and relied upon by counsel for respondents, are as follows:

"The municipal corporation known as Kansas City, . . . may exercise all municipal, incidental and business powers necessary or which may be deemed expedient . . . and necessary to maintain the public peace, protect property and promote the public welfare, and preserve the health of the inhabitants of the city, whether such powers be expressly enumerated herein or not; and may have and exercise within the city limits . . . all governmental and police powers, subject to the limitations prescribed by the Constitution and laws of this State and the United States." [Charter of 1909, art. 1, sec. 1, paragraph 13.]

". . . The mayor and common council shall have power and authority, by ordinance . . . to secure the general health and safety of the inhabitants by any necessary measure: . . . to declare, prevent and abate nuisances on public or private property, and the causes thereof." [Charter of 1909, art. 3, sec. 1, clause 16.]

". . . The common council shall have power to pass, publish, amend and repeal all such ordinances, rules and regulations not inconsistent with the provisions of this charter or contrary to the laws of the State or of the United States as it may deem to be expedient or necessary in maintaining the peace, order, good government, health and welfare of the city, its trade, commerce, manufactures, or that may be necessary and proper to carry into effect the provisions of this charter." [Charter of 1909, art. 3, sec. 1, clause 41.]

If it were conceded that Union Cemetery was in point of fact a nuisance and detrimental to public

health, then under the far-reaching grants of power conferred upon Kansas City by these charter provisions, it would be difficult to conceive upon what solid ground this contention could rest.

Those provisions in express terms authorized that city to exercise all municipal power "necessary to promote the public welfare, and preserve the health of the inhabitants of the city;" that by ordinance the city shall have authority "to secure the general health and safety of the inhabitants; . . . to declare, prevent and abate nuisances on public or private property," etc., and the "common council shall have power to pass, publish, amend and repeal all ordinances . . . as it may deem to be expedient or necessary in maintaining the peace, order, good government, health and welfare of the city," etc.

The language of these provisions is so plain and definite in meaning that they are not susceptible of construction.

They simply mean what they say, that the city has the power and authority to abate any nuisance or do anything within its corporate capacity to preserve the health and welfare of the city. This would clearly authorize the passage of the ordinance in question, and it has been so held in numerous cases. [Campbell v. City of Kansas, 102 Mo. 326, 344, 350, 10 L. R. A. 593; Laurel Hill Cemetery v. San Francisco, 152 Cal. 464, 14 Am. & Eng. Ann. Cas. 1080, 27 L. R. A. (N. S.) 260, affirmed in Laurel Hill Cem. v. San Francisco, 216 U. S. 358, 54 L. Ed. 515; Odd Fellows' Cem. v. San Francisco, 140 Cal. 226; Kincaid's Appeal, 66 Pa. St. 411, 423; People ex rel. Cem. Assn. v. Pratt, 129 N. Y. 68, 72; Stuyvesant v. New York, 7 Cow. 588, 604; Young v. Board of Com'rs, 51 Fed. 585, 592.] Also, see: Board of Commissioners v. Young, 59 Fed. 96, l. c. 109; Charleston v. Baptist Church, 4 Strob. L. (S. C.) 306, l. c. 310; Commonwealth v. Fahey, 5 Cush. (Mass.) 408, l. c. 411; Iuszkewicz v. Luther, 30 R. I.

570; Humphrey v. Church, 109 N. C. 132; Page v. Symonds, 63 N. H. 17, l. c. 20; Craig v. Church, 88 Pa. St. 42, l. c. 52.

In addition to this, the general welfare clause of the charter which is practically the same in all the charters of the cities of this State, was ample authority to the council to pass said ordinance. [St. Louis Gunning Company v. St. Louis, 235 Mo. 99.]

Counsel for plaintiffs concede that this ruling might be sound if it was not for the fact that the charter of the Union Cemetery is an act of the Legislature, and that according to the express provisions of paragraph 41 of section 1 of article 3 of the Charter of 1909, before quoted, where it is expressly provided that "the common council shall have power to pass, publish, amend and repeal all such ordinances, rules and regulations *not inconsistent* with the provisions of this charter or *contrary to the laws of the State* or of the United States as it may deem to be expedient or necessary in maintaining the peace, order, good government, health and welfare of the city."

That being true, it is argued that in order to repeal the charter of the Union Cemetery, the ordinance in question must of necessity be inconsistent with and contrary to the provisions thereof, which as shown is an act of the Legislature, or a law of the State. And being so inconsistent with and contrary to said law of the State, it is contended that under said provision of the city charter, the ordinance and not the charter of the Union Cemetery, which is an act of the Legislature, or a law of the State, must yield and give way.

Cemetery: Chartered by Special Statute: Suppression by City.

This argument is more plausible than sound, for while it is true the charter of the Union Cemtery is a special act of the Legislature, yet it has no more force and effect than if it had been incorporated under the general corporation laws of the State, and if burials

could by ordinance have been prohibited in the latter case, then I am unable to see any good reason for holding that it could not have been prohibited in the former.

The courts consider the substance and not the letter of the law, when enforcing its provisions. By abating the nuisance, if one it is, the charter of the cemetery is not repealed, but the further burial of dead bodies therein is prohibited, because of the changed conditions of things; that which was formerly harmless has become dangerous to the public health of the city. This is but the exercise of the police power which neither the city nor State can surrender or bargain away. All the authorities so hold. [St. Louis Gunning Co. v. St. Louis, supra; Mugler v. Kansas, 123 U. S. 623; Slaughter House Cases, 111 U. S. 746.]

Nor can either of them preclude itself from enacting laws forbidding burials in places when they constitute a public nuisance. [Brick Pres. Church v. New York, 5 Cow. 538; Board of Commissioners v. Young, 59 Fed. 96.]

We are, therefore, of the opinion that this contention of plaintiffs is not well taken.

III. Returning to the question previously stated: Is the ordinance complained of reasonable? That is, was it enacted for the preservation of the public health of Kansas City?

Unreasonable Ordinance: Stopping Burials in Cemetery.

We have with great care and with much pains read the voluminous record in this case, covering about five hundred and fifty pages, and have carefully set out the substance of the evidence introduced by both parties bearing upon this question, as well as that touching the manner in which the cemetery was managed and controlled; and after a careful consideration of the weight thereof, we have reached the conclusion that this ordinance was not enacted for the

purpose of preserving the public health of the city, but was passed at the instigation and request of a lot of real estate agents, landowners and speculators, who think that this cemetery stands in the way of the expansion and development of Kansas City in that direction; and especially is that true since the location of the new Union Depot has been definitely located in that vicinity.

In the first place, the complaints of the living were as silent as those of the dead, as to the unsanitary condition of the cemetery until the railroads of the city finally determined to locate the Union Depot in the vicinity of this cemetery. Since that time, however, the question has been agitated, not by the citizens generally of Kansas City, by or through their representatives, neither in its municipal capacity nor by its Board of Health, which has the most ample authority under the charter of the city to investigate and abate, either by direct action or by appeal to the Common Council, any and all public or private nuisances or other matters, which do or may affect the public health of the city, but by those citizens who have discovered, in recent years, that this cemetery is and has retarded the growth and expansion of the city in the line of their property, and thereby and in consequence thereof, the values of their property have not increased in the degree in which they think they would have done had it not been for the presence of the cemetery.

That class of citizens, and they alone, for purely commercial purposes, and for anticipated financial advantages, petitioned for and pressed the passage of this ordinance.

Not even the Board of Health or Mr. Ward, the councilman from that ward, whose sworn duty it was to look after and preserve the public health of the city, knew of or ever heard of any deleterious effects the cemetery ever had upon the health and welfare of the city, until the petitions asking for the abolition of this

cemetery was by said interested parties filed with the Common Council. And still more strange, no member of said board appeared or was subpoenaed as a witness in this case, to testify that the cemetery was deleterious to public health, which unquestionably they would have done had that been true.

While Mr. Ward, the councilman from that ward, did testify, yet he in express words said he introduced said ordinance in the lower house and voted for its enactment because the citizens of his ward, residing in that vicinity, petitioned him to do so, and not a word of evidence escaped his lips tending to show that he introduced said ordinance or voted for the same from a sense of duty that it was beneficial to public health, thereby clearly leaving the irresistible inference that he did so because it was for the promotion of the financial and commercial interests of his constituency.

Moreover, there is not a word of testimony preserved in this record which tends to show that this cemetery was in fact deleterious to public health.

All of the witnesses who testified as to this question in behalf of the defendants, invariably stated that such *conditions might* produce disease, death and destruction, but not one of them stated as a fact that this cemetery gave off any bacteria or deadly germs, or that any of the pools or ponds mentioned in the evidence contained a single germ, or that the water, rats, mice or any domestic animal ever carried or distributed germs of that character over the area of the city. Nor does the evidence show that a single case of sickness, disease or death was caused by the presence of said cemetery. In truth, no attempt whatever was made by defendants to show any such facts, but upon the contrary, what little evidence there was introduced by plaintiffs tended to prove the contrary, that is, there were not so many cases of contagious and infectious diseases reported to the Board of Health

from that vicinity as were done from other localities of the city.

Under this showing, we have no hesitancy whatever in holding that said ordinance is unreasonable, oppressive and tyrannical. For in order to financially benefit a few property owners and speculators in that vicinity, they, through the innocent action of the Common Council, are ready and willing to sacrifice the final resting place of those stalwart men and women who made Kansas City what it is, and without whose efforts the city would not be worth mentioning. They built the city, developed its commerce, and made Kansas City what it is. They also, as a part of their life's work, created and adopted this cemetery as a final resting place for their ashes, which, in anticipation, was as near and dear to them in life as were the residences in which they lived, the stores in which they bartered and sold, the factories in which they labored and the counting houses in which they exchanged values.

This city of the dead, which is honored and revered by all civilized people, including the cost of the interments and expenses of monuments erected to their sacred memory, to say nothing of the cost of preserving and beautifying the graves, I dare say, has cost the deceased and the relatives and friends, not less than six or eight millions of dollars, to say nothing of this wholesale, unholy desecration—a financial destruction of values, which would far excel the financial benefits these petitioners could ever hope to receive therefrom, even though their fondest hopes should be crowned with success.

In the case of the American Tobacco Co. v. City of St. Louis, supra, where the benefits to be derived and the damages which would have been sustained by reason of the enforcement of the ordinance therein mentioned, were far greater than the benefits here to be received and far less than the damages that would be here inflicted, yet for those reasons, among others, the

court in Banc unanimously held the ordinance therein
mentioned, to be unreasonable, oppressive and void;
and by parity reasoning and for greater considerations
existing in this case, we believe and hold that this ordi-
nance is unreasonable and oppressive and should for
that reason be declared and held to be null and void,
which is accordingly done.

Judge L. C. Slavens appeared in this court as
counsel for certain lot owners in the cemetery, in the
capacity of intervenors, I suppose, but who were not
represented in the court below, and asks that this court
find and decree that the cemetery owes certain duties
to preserve and beautify the cemetery and the graves
thereof, and that this court require the officers there-
of to provide and set apart a fund sufficient, and out
of which said cemetery may be preserved, cared for,
and with which to beautify the graves therein.

In answer to that request we will state that while
there seems to be much merit in this request, as in-
cidentally appears from this record, yet no such ques-
tion was presented by the pleading or established by
the evidence or considered by the trial court, and for
that reason, however desirous we might be to afford
the relief thus prayed, yet it is perfectly apparent
that under the present condition of the pleadings and
evidence in the case, we have no jurisdiction to so do.
Such a holding would clearly deprive the cemetery com-
pany of its property without due process of law, with-
in the meaning of both the State and Federal constitu-
tions.

Much of the evidence introduced in this case and
previously set forth in this opinion, bears upon this
question, which may and should justify, on the part
of the city and lot owners, stricter regulations, better
preservation and more suitable care and attention, both
to the grounds and graves therein, than has heretofore
been shown them, but in no sense does or should that
evidence which constitutes the great bulk of this rec-

ord warrant the city in abolishing the cemetery out-right, which is practically done in this ordinance, if it is to stand. So hold many of the cases cited.

For this reason we decline to pass upon this question one way or the other, in order that if these parties desire to have that question adjudicated, they may do so by instituting in the proper court, proper proceedings for that purpose.

We are, therefore, of the opinion that the judgment of the circuit court should be reversed with directions to enter judgment in favor of the plaintiffs, enjoining Kansas City and its agents and officers from interfering with burials in said cemetery and from putting in force the provisions of said ordinance; and it is so ordered. *Lamm, C. J.,* and *Graves, Walker* and *Faris, JJ.,* concur; *Brown, J.,* concurs in separate opinion; *Bond, J.,* dissents as to paragraph three and as to result.

## CONCURRING OPINION.

BROWN, J.—I heartily concur in the result of the opinion prepared by my learned brother WOODSON. While I am sure the ordinance prohibiting all future burials in Union Cemetery is unreasonable and its enforcement should be enjoined, I think the record shows a state of affairs which would justify an ordinance requiring and compelling the plaintiff to abate all pools of water in its cemetery, to provide storm sewers to convey surface water and seepage from the graves to the northern boundary of its property, where such water may be carried away by a natural watercourse (or other sewers); to require all graves to be kept filled level with or above the surface, and to make all future interments not less than six feet below the natural surface of the ground.